Ward T. EVANS, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 67,2004.

Supreme Court of Delaware.

Submitted: March 16, 2005.

Decided: April 11, 2005.

Reargument Denied April 22, 2005.

Court Below—Superior Court of the State of Delaware, in and for Kent County, Cr. ID. No. 88K01678DI.

James Brendan O'Neill, Esquire, Bernard J. O'Donnell, Esquire and James D. Nutter, Esquire, Assistant Public Defenders, Wilmington, Delaware, for appellant.

Loren C. Meyers, Esquire, Gregory E. Smith, Esquire and Kim E. Ayvazian, Esquire, Department of Justice, Wilmington, Delaware, for appellee.

Thomas J. Allingham, II, Esquire, Skadden, Arps, Slate, Meagher & Flom, Wilmington, Delaware, amicus curiæ.[1]

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and HARTNETT,[2] Justices, constituting the Court en Banc.

PER CURIAM.

This is an appeal from a final judgment of the Superior Court. In an opinion issued by this Court on November 23, 2004, that judgment was reversed. As a matter of Delaware law, however, our prior decision in this proceeding did not become final.

During the pendency of this appeal, House Bill No. 31[3] was enacted by the General Assembly and signed into law by the Governor, although the Governor questioned its constitutionality.[4] House Bill No. 31 declares the November 23, 2004 decision in this specific proceeding "null and void," directs this Court generally on matters of statutory construction, and states that the "General Assembly asserts its right and prerogative to be the ultimate

---

1. This Court appointed Mr. Allingham to act as amicus curiæ. We appreciate his *pro bono* professional services.

2. Sitting by designation pursuant to Del. Const. art. IV, § 38 and Del.Code Ann. tit. 29, § 5610(a)(2) (2001) and Del.Supr. Ct. R. 2, 4.

3. 75 Del. Laws, c. 1, § 1.

4. In a letter requesting the Justices' opinions concerning the constitutionality of House Bill No. 31, the Governor stated: "I question the constitutionality and enforceability of several provisions of the bill." As a result of this decision, that request becomes moot.

arbiter of the intent, meaning, and construction of its laws." In this opinion, we hold that House Bill No. 31 is unconstitutional in its entirety. That legislation, therefore, has no bearing on our reconsideration of the merits of Evans' appeal.

The question presented in this appeal is whether the life sentence currently being served by Evans makes him eligible for release from incarceration *only* if parole is granted. The answer depends upon whether Evans' life sentence is controlled by this Court's holding in *Jackson*[5] or by our holding in *Crosby v. State.*[6] We conclude that Evans' life sentence is controlled by the holding in *Jackson.* Therefore, unless he is granted parole, Evans is not eligible for release from incarceration prior to his death.

In this opinion, we reconsider our prior decision. Although *en Banc* opinions are not withdrawn frequently, it does happen occasionally.[7] We have concluded that the opinion issued by this Court on November 23, 2004, must be withdrawn. We have also concluded that the judgment of the Superior Court must be affirmed.

### Facts

On September 29, 1982, a jury convicted Evans of Rape in the First Degree. Evans was sentenced to life in prison with the possibility of parole. The status sheet completed by the Department of Correction did not give Evans a conditional release date. Rather, it listed Evans' maximum release date as "death" and recites his maximum sentence, less good time, as "life."

In 1993, 1996 and 1999, the Board of Parole denied Evans' requests for parole. On January 8, 2004, Evans filed a motion for post-conviction relief in the Superior Court, claiming that his sentence was illegal. Evans argued that under the conditional release statute in existence when his crimes were committed, he was entitled to have a conditional release date calculated as if his life sentence were a term of forty-five years.

The Superior Court denied Evans' motion. It did so without any analysis and without issuing an opinion. The Superior Court's ruling is simply a checked box on a preprinted form. Evans then appealed.

On appeal, Evans argues that this Court's decision in *Crosby v. State*[8] requires that his life sentence be calculated as a forty-five year term for purposes of determining his qualification for conditional release. In its initial answering brief with this Court, the State admitted that Evans' argument was correct. Thereafter, this Court granted the State's motion to withdraw that brief, after which the State filed a "Substituted Answering Brief," now arguing that Evans' case is controlled by this Court's decision in *Jackson.*[9]

As earlier noted, our opinion of November 23, 2004 did not become final. We later decided to reconsider that opinion and asked the parties to file supplemental memoranda. Unfortunately, despite the serious issues presented in this case, the

---

5. *Jackson v. Multi–Purpose Criminal Justice Facility,* 700 A.2d 1203 (Del.1997).

6. *Crosby v. State,* 824 A.2d 894 (Del.2003).

7. *See Haas v. United Tech. Corp.,* 450 A.2d 1173 (Del.1982) (prior *en Banc* opinion withdrawn); *Pathe Indus., Inc. v. Cadence Indus. Corp.,* 425 A.2d 952 (Del.1981) (prior *en Banc* opinion withdrawn). *Compare Gondeck v.*

*Pan Am. World Airways, Inc.,* 382 U.S. 25, 26, 86 S.Ct. 153, 15 L.Ed.2d 21 (1965) (reopening a final judgment in the interests of justice).

8. *Crosby v. State,* 824 A.2d 894 (Del.2003).

9. *Jackson v. Multi–Purpose Criminal Justice Facility,* 700 A.2d 1203 (Del.1997).

State initially failed to address one of our inquiries, and we directed the State to file a complete response. The supplemental briefing is now concluded.

### House Bill No. 31

House Bill No. 31 declares that the November 23, 2004 decision of this Court in this very proceeding to be "null and void."[10] House Bill No. 31 also declares that the Delaware Constitution "vests authority and sole responsibility for lawmaking in the General Assembly." House Bill No. 31 further provides that "the General Assembly asserts its right and prerogative to be the ultimate arbiter of the intent, meaning, and construction of its laws, and to vigorously defend them."[11]

### Separation of Powers

The defining principle of the American constitutional form of government is separation of powers.[12] In the United States, the foundation for both our national and state governments are three separate branches—the legislative, executive, and judicial, each coordinate and in the main independent of the others.[13] As the United States Supreme Court stated over one hundred years ago:

It is believed to be one of the chief merits of the American system of written constitutional law, that all powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other.[14]

The American tripartite system of separating governmental authority was the result of a combination of historical experience and contemporary political theory. The desirability of dividing the power of government into three main divisions is traceable to numerous philosophers beginning with Aristotle.[15] The more immedi-

---

10. See House Bill No. 31, Section 1, § 5402.

11. Id.

12. See M.J.C. Vile, *Constitutionalism and the Separation of Powers* 1–175 (1967); and William B. Gwyn, *The Meaning of the Separation of Powers* (Tulane Studies in Political Science, IX [New Orleans, 1965] ). See also, John A. Fairlie, *The Separation of Powers*, 21 Mich. L.Rev. 393–436 (1922); Malcolm P. Sharp, *The Classical American Doctrine of "The Separation of Powers,"* 2 U. Chi. L.Rev. 385–436 (1935); B.F. Wright, Jr., *The Origins of the Separation of Powers*, 13 Economica 169–85 (1933); William S. Carpenter, *The Separation of Powers in the Eighteenth Century*, 22 Amer. Pol. Sci. Rev. 32–44 (1928); Francis G. Wilson, *The Mixed Constitution and the Separation of Powers*, 15 Sw. Soc. Sci. Q. 14–28 (1934–35).

13. John A. Fairlie, *The Separation of Powers*, 21 Mich. L.Rev. 393 (1922).

14. *Kilbourn v. Thompson*, 103 U.S. 168, 190, 26 L.Ed. 377 (1880). M.J.C. Vile, *Constitutionalism and the Separation of Powers* 13 (1967).

15. In his *Politics*, based on his study of Athens and other Greek city states, Aristotle identifies three main governmental agencies: the general assembly, deliberating upon public affairs; the public officials; and the judiciary. Book IV, ch. 14, *cited in* John A. Fairlie, *The Separation of Powers*, 21 Mich. L.Rev. 393, 393 (1922).

ate influences on colonial America, however, were philosophers such as Charles Montesquieu,[16] Jean Jacques Rousseau,[17] and John Locke;[18] and English common law scholars like Edward Coke, Henry deBracton, and William Blackstone.[19] In advising against the concentration of governmental power, Montesquieu wrote:

> When the legislative and executive powers are united in the same person, or in the same body of magistracy, there can be then no liberty .... Again, there is no liberty, if the power of judging be not separated from the legislative and executive powers. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be then the legislator. Were it joined to the executive power, the judge might behave with all the violence of an oppressor. There would be an end to everything, were the same man, or the same body, whether of the nobles or of the people, to exercise those three powers, that of enacting laws, that of executing the public resolutions, and of trying the causes of individuals.[20]

These principles—derived from philosophies and theories of political science—were well known to American statesmen in 1776. Because separation of powers was generally considered by American colonists to be a fundamental maxim of proper government, its absence under the English rule of King George III eventually became intolerable and led to the American Revolution.

### First State Constitutions

The Declaration of Independence was the catalyst that elevated the separation of powers doctrine into what is now known as "a first principle of free government."[21] The Declaration of Independence expressed the concerns that required "dissolv[ing] the political bands" with England. Those concerns included interference with the judicial process by the King and Parliament, by: obstructing "the Administration of Justice by refusing his Assent to Laws for establishing Judiciary Powers;" making "Judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries;" and "depriving us in many cases of the benefits of Trial by Jury."

Independence from England meant that each of the former colonial states became a new sovereign entity. In 1776, that status required each colonial state to draft its own constitution. The framers of the first state constitutions had lived under a system of intermingled legislative and judicial powers. In the 17th and 18th centuries colonial legislatures in America functioned as courts of equity of last resort, by either hearing original actions or providing appellate review of judicial judgments.[22] Often,

---

16. *See* Baron De Montesquieu, *The Spirit of the Laws* (Thomas Nugent trans., 1949).

17. *See* Paul M. Spurlin, *Rousseau in America,* 1 French–American Review 8–16 (1948).

18. John Locke, *The Second Treatise of Government* §§ 221, 243 (T. Peardon ed., 1952).

19. Daniel A. Farber & Suzanna Sherry, *A History of the American Constitution* 6 (1990). 1 William Blackstone, *Commentaries on the Laws of England* 150–51 (a Facsimile of the First Edition of 1765–69 by University of Chicago Press 1979).

20. Baron De Montesquieu, *The Spirit of the Laws* n. 39.

21. Philadelphia *National Gazette* (Gaillard Hunt, ed., Feb. 6, 1792), quoting VI *The Writings of James Madison* 91 (N.Y., 1900–10). William B. Gwyn, *The Meaning of the Separation of Powers* (Tulane Studies in Political Science IX [New Orleans 1965] ).

22. Gordon S. Wood, *The Creation of the American Republic 1776–1787,* 154–55 (1969).

however, those hybrid legislative and judicial assemblies decided to inject themselves into the judicial process by enacting special bills. It was common for such legislation to nullify the judicial judgment in a particular case.[23]

The first state constitutions reflect the desirability of separating the legislative from the judicial power, prompted by royal and legislative interference with judgments of the American colonial courts. Notably, Delaware's 1776 Constitution[24] and all of the other first state constitutions, provided for the same three departments. Six of those constitutions contained a general clause expressly allocating the powers of government among these three branches—the legislative, executive, and judicial. Although the specific provisions varied, the legal result reflected in each of the first state constitutions was the same: to define the sovereign power with precision and to restrain its exercise within marked boundaries.[25]

From 1776 until 1787, the doctrine of separation of powers was expanded and exalted to the foremost position in the American framework of constitutionalism.

By the 1780's many believed that the principle of separation of powers was "the basis of all free governments," the most important attribute of the kind of government for which they had fought the American Revolutionary War.[26] According to Thomas Jefferson, "the powers of government should be so divided and balanced among several bodies of magistracy, as that no one could transcend their legal limits, without being effectually checked and restrained by the others."[27] In a September 28, 1787 letter to John Adams, Jefferson wrote: "The first principle of a good government is certainly a distribution of its powers into executive, judiciary, and legislative and a subdivision of the latter into two or three branches."[28]

### United States Constitution

At the time Jefferson wrote that letter to Adams, the United States Constitution was submitted to the states for ratification in 1787. A primary collective concern of the states was whether the proposed Constitution included strong provisions for separating the powers of government. The Federalist papers were written in defense of the proposed federal Constitution.

23. M. Clarke, *Parliamentary Privilege in the American Colonies* 49–51 (1943). *See, e.g., Judicial Action by the Provincial Legislature of Massachusetts,* 15 Harv. L.Rev. 208 (1902) (collecting documents from 1708–1709); 5 Laws of New Hampshire, *Including Public and Private Acts, Resolves, Votes, Etc.,* 1784–1792 (Metcalf ed.1916); Robert Ludlow Fowler, *The Origin of the Supreme Judicial Power in the Federal Constitution,* 29 Am. L.Rev. 713 (1895). *See also* 1 James Bradley Thayer, *Cases on Constitutional Law* 78 n. 1 (Cambridge, Mass., George H. Kent ed., 1895); *Appeals from Colonial Courts to the King in Council, with Especial Reference to Rhode Island,* Ann. Rep. of the Am. Hist. Ass'n 299–350 (1894).

24. *State ex rel. Biggs v. Corley,* 172 A. 415, 419 (Del.1934).

25. *See* Randy J. Holland, *State Constitutions: Purpose and Function,* 69 Temp. L.Rev. (1996). *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 45, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (Souter, J., dissenting) (citing *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 398–99, 1 L.Ed. 648 (1798) (Iredell, J., dissenting in part)).

26. Portsmouth, *N.H. Gazette,* Mar. 15, 1783; Jefferson, *Notes on Virginia,* ed. Peden, 120. 3 Jefferson's Words (Ford ed., 1892), 424–25.

27. Jefferson, *Notes on Virginia,* ed. Peden, 120. 3 Jefferson's Words (Ford ed., 1892), 424–25.

28. 3 *Jefferson's Words* (Ford ed., 1892), 424–25.

They were published in 1787 and 1788 as the joint work of Alexander Hamilton, James Madison, and John Jay.

In an effort to give the states assurance during the ratification process, Federalist No. 81 explained that the proposed federal Constitution's formulation for separating the powers of government was modeled after many existing state constitutions. Indeed, Delaware's 1776 Constitution was cited as one of the model state constitutions for separating legislative and judicial powers:

> These considerations teach us to applaud the wisdom of those states, who have committed the judicial power in the last resort, not to a part of the legislature, but to distinct and independent bodies of men. Contrary to the supposition of those, who have represented the plan of the convention in this respect as novel and unprecedented, it is but a copy of the constitutions of New Hampshire, Massachusetts, Pennsylvania, Delaware, Maryland, Virginia, North–Carolina, South–Carolina and Georgia; and the preference which has been given to these models is highly to be commended.[29]

### Legislative Interference With Specific Cases Prohibited

Federalist No. 81 also explained that the separation of powers in the proposed federal Constitution would preclude the national legislature from interfering with a "particular case," in exactly the same way that the state constitutions prohibited such legislative interference.

> A legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases. This is the principle, and it applies in all its consequences, exactly in the same manner and extent, to the state governments, as to the national government, now under consideration. Not the least difference can be pointed out in any view of the subject.[30]

Thus, in 1792, James Madison was describing the separation of powers doctrine as "a first principle of free government." [31]

That same year, Delaware adopted a new Constitution, after a convention over which John Dickinson presided.[32] Under Dickinson's formulation, Delaware's 1792 Constitution again separated its powers of government by keeping them both "distinct in department" and "distinct in office, and yet connected in operation." [33] As Dickinson observed, "in a well-regulated state, judges ought to be equally independent of the executive and legislative powers." [34]

*Both federal and state judicial decisions, in the first few decades after ratifi-*

29. The Federalist No. 81, at 544–45 (Alexander Hamilton) (Jacob E. Cooke ed., 1961). *See also* The Federalist, Nos. 47–51 (James Madison).

30. The Federalist No. 81, at 545 (Alexander Hamilton) (Jacob E. Cooke, ed.1961).

31. Philadelphia *National Gazette*, Feb. 6, 1792, VI *The Writings of James Madison* 91 (Gaillard Hunt, ed. N.Y.1900–10).

32. *Claudio v. State*, 585 A.2d 1278, 1295 (Del. 1991).

33. *The Political Writings of John Dickinson* (1801). John Dickinson, *Letters of Fabius*, Pamphlets, 182–83 (Ford, ed.). Jefferson to John Adams, Sept. 28, 1787, Boyd, ed., *Jefferson Papers*, XII, 189; [John Dickinson], *Letters of Fabius*, Ford, ed., *Pamphlets*, 182–83; Wilson, "Lectures on Law," Wilson, ed., I *Works of Wilson* 435. *In re Request of the Governor for an Advisory Opinion*, 722 A.2d 307 (Del.1998).

34. Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 123 (2002).

cation of the United States Constitution and the adoption of Delaware's 1792 Constitution, reflect a consensus that the principle of separation of powers prohibited legislative interference with the judgments of American courts in specific cases. In *Calder v. Bull*,[35] the Connecticut legislature had enacted a statute that set aside the final judgment of a state court in a civil case. The sole issue before the United States Supreme Court was the construction of the *Ex Post Facto* Clause of the United States Constitution. Nevertheless, Justice Iredell, a leading Federalist who led the United States Constitution to ratification in North Carolina, noted:

the Legislature of [Connecticut] has been in the uniform, uninterrupted, habit of exercising a general superintending power over its courts of law, by granting new trials. It may, indeed, appear strange to some of us, that in any form, there should exist a power to grant, *with respect to suits depending or adjudged,* new rights of trial, new privileges of proceeding, not previously recognized and regulated by positive institutions .... *The power ... is judicial in its nature;* and whenever it is exercised, as in the present instance, it is an exercise of judicial, not of legislative, authority.[36]

The decisions of the highest state courts during that period reflect the same understanding of the separation of powers. In *Bates v. Kimball*,[37] for example, a special

act of the Vermont Legislature authorized a party to appeal from the judgment of a court even though the time for appeal had expired. The Vermont Supreme Court framed the question before it as: "Have the Legislature power to vacate or annul an existing judgment between party and party?"[38] The answer was unequivocal: "The necessity of a distinct and separate existence of the three great departments of government ... had been proclaimed and enforced by ... Blackstone, Jefferson and Madison," and had been "sanctioned by the people of the United States, by being adopted in terms more or less explicit, into all their written constitutions."[39] Citing the United States Supreme Court's decision in *Hayburn's Case*,[40] the Vermont Supreme Court held that the power to annul a final judgment was "an assumption of Judicial power," and, therefore, forbidden.[41]

### Individual Cases Decided Under Judicial Power

■■■ Turning to the issue in this case, the constitutionality of House Bill No. 31, we start with the proposition that "the doctrine of separation of powers is integral to the fabric of the Delaware Constitution."[42] The history of Delaware "admits of no doubt that from the beginning our state government has been divided into the three departments, legislative, executive and judicial. It is likewise true that, generally speaking, one department may not

---

35. *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 1 L.Ed. 648 (1798).

36. *Id.* at 398 (emphasis added).

37. *Bates v. Kimball,* 2 D. Chip. 77 (Vt.1824).

38. *Id.* at 83.

39. *Id.* at 84.

40. *Hayburn's Case,* 2 U.S. (2 Dall.) 408 (1792).

41. *Id.* at 90. *See also Merrill v. Sherburne,* 1 N.H. 199 (N.H.1818) (legislature may not vacate a final judgment and grant a new trial); *Lewis v. Webb,* 3 Me. 326 (Me.1825); T. Cooley, *Constitutional Limitations* 95–96 (1868) (collecting cases); J. Sutherland, *Statutory Construction* 18–19 (J. Lewis ed.1904).

42. *Joseph v. C.C. Oliphant Roofing Co.,* 711 A.2d 805, 808 (Del.Super.Ct.1997).

encroach on the field of either of the others." [43]

In *Marbury v. Madison,* Chief Justice John Marshall observed that the United States Constitution "vests the whole judicial power of the United States in one supreme court, and such inferior courts as Congress shall, from time to time, ordain and establish." [44] Similarly, the Delaware Constitution vests the entire judicial power of our government exclusively in the judiciary. Article IV, § 1 of the Delaware Constitution provides: "The judicial power of this State shall be vested in a Supreme Court ... and such other courts as from time to time by law [be] established."

■■■ The judicial function is to interpret the law and apply its remedies and penalties in particular cases. [45] The judiciary has "the power, not merely to rule on cases but to decide them ... with an understanding, in short, that 'a judgment conclusively resolves the case' because 'a "judicial power" is one to render dispositive judgments.'" [46] In that regard, the Delaware Constitution specifically vests this Court with jurisdiction to hear appeals from the Superior Court in criminal causes and to determine all matters *finally.* Del. Const. Art. IV, § 11 so provides:

> The Supreme Court shall have jurisdiction ... [t]o receive appeals from the Superior Court in criminal causes, upon application of the accused in all cases in which the sentence shall be death, imprisonment exceeding one month, or fine exceeding One Hundred Dollars, and in such other cases as shall be provided by law; and *to determine finally all matters of appeal on the judgments and proceedings of said Superior Court in criminal causes ....* [47]

The United States Supreme Court has held that the principal effect to be accomplished by the separation of legislative from judicial power is that " '[a] legislature without exceeding its province cannot reverse a determination once made, in a particular case; though it may prescribe a new rule for future cases.'" [48] In 1868, the eminent constitutional scholar Thomas Cooley addressed precisely the question presented by House Bill No. 31:

> If the legislature cannot thus indirectly control the action of the courts, by requiring of them a construction of the law according to its own views, it is very plain it cannot do so directly, by setting aside their judgments, compelling them to grant new trials, ordering the discharge of offenders, or directing what particular steps shall be taken in the progress of a judicial inquiry. [49]

Summarizing the separation of powers principles in the United States, Professor Bernard Schwartz concludes:

> [D]eclaratory acts seeking to interpret earlier legislation and to give such inter-

---

**43.** *Tr. of New Castle Common v. Gordy,* 93 A.2d 509, 517 (Del.1952) (citations omitted). *See also Joseph v. C.C. Oliphant Roofing Co.,* 711 A.2d at 808.

**44.** *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 173, 2 L.Ed. 60 (1803).

**45.** John A. Fairlie, *The Separation of Powers,* 21 Mich. L.Rev. 393 (1922).

**46.** *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211, 218–19, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (emphasis and citations omitted).

**47.** Del. Const. art. IV, § 11 (emphasis added).

**48.** *Plaut v. Spendthrift Farm, Inc.,* 514 U.S. at 222, 115 S.Ct. 1447 (quoting The Federalist No. 81 (Alexander Hamilton)).

**49.** *Id.* at 225, 115 S.Ct. 1447 (quoting Thomas Cooley, *Constitutional Limitations* 94–95 (1868) (collecting cases)).

pretation retroactive effect are generally condemned. The legislature cannot set aside a construction of the law already applied by the courts in actual cases. As the high bench once put it, "To declare what the law is, or has been, is a judicial power; to declare what the law shall be, is legislative. One of the fundamental principles of all our governments is, that the legislative power shall be separated from the judicial." Similarly, the legislature cannot interfere directly in litigation. Thus, it cannot annul, set aside, vacate, reverse, modify, or impair the judgment of a competent court. It cannot compel the courts to grant new trials, order the discharge of offenders, or direct what particular steps shall be taken in a particular judicial proceeding.[50] Every decision of the United States Supreme Court since its 1792 opinion in *Hayburn's Case* has uniformly held that such a legislative act exceeds the power of the legislature.[51]

■ House Bill No. 31 declares this Court's November 23, 2004 decision in this very proceeding (*Evans v. State*) is "null and void." Where retroactive legislation—such as House Bill No. 31—requires its own application in a case already adjudicated, it "reverse[s] a determination once made, in a particular case."[52] That is constitutionally impermissible, because only the Delaware judiciary has the power, "province and duty ... to say what the law is" in particular cases and controversies.[53]

The provision in section 5402 of House Bill No. 31, that declares this Court's decision in *Evans v. State* "null and void," is a legislative act that purports to exercise judicial power in a specific case. As such, that provision in House Bill No. 31 violates Article IV, §§ 1 and 11 of the Delaware

---

**50.** Bernard Schwartz, *A Commentary on The Constitution of the United States: The Powers of Government* 117 (1963) (quoting *U.S. v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944)).

**51.** *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 218–19, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). *See, e.g., Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113, 68 S.Ct. 431, 92 L.Ed. 568 (1948) ("Judgments within the powers vested in courts by the Judiciary Article of the Constitution may not lawfully be revised, overturned or refused faith and credit by another Department of Government"); *United States v. O'Grady*, 89 U.S. (22 Wall.) 641, 647–48, 22 L.Ed. 772 (1875) ("Judicial jurisdiction implies the power to hear and determine a cause, and ... Congress cannot subject the judgments of the Supreme Court to the re-examination and revision of any other tribunal ...."); *Gordon v. United States*, 117 U.S. 697, 700–704 (1864) (opinion of Taney, C.J.) (judgments of Article III courts are "final and conclusive upon the rights of the parties"); *Hayburn's Case*, 2 U.S. (2 Dall.) 408, 411 (1792) (opinion of Wilson and Blair, JJ., and Peters, D.J.) ("[R]evision and control" of Article III judgments is "radi-

cally inconsistent with the independence of that judicial power which is vested in the courts"); *Id.* at 413 (opinion of Iredell, J., and Sitgreaves, D.J.) ("[N]o decision of any court of the United States can, under any circumstances, ... be liable to a revision, or even suspension, by the [l]egislature itself, in whom no judicial power of any kind appears to be vested"). See also *Pa. v. Wheeling & Belmont Bridge Co.*, 59 U.S. (18 How.) 421, 431, 15 L.Ed. 435 (1856) ("[I]t is urged, that the act of congress cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby .... This, as a general proposition, is certainly not to be denied, especially as it respects adjudication upon the private rights of parties. When they have passed into judgment the right becomes absolute, and it is the duty of the court to enforce it.").

**52.** The Federalist No. 81 at 545 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

**53.** *State ex rel. Oberly v. Troise*, 526 A.2d 898, 905 (Del.1987) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803)).

Constitution.[54]

### *Laws Interpreted Under Judicial Power*

◼ House Bill No. 31 is unconstitutional in other respects as well. The United States Supreme Court has recognized that the "essential balance" created by the separation of governmental authority in the existing state constitutions and the proposed United States Constitution "was a simple one. The Legislature would be possessed of the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' but the power of '[t]he interpretation of the laws' would be 'the proper and peculiar province of the courts.'" [55] Accordingly, two hundred years ago, in *Marbury v. Madison*, the United States Supreme Court held:

> It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and *interpret* that rule. If two laws conflict with each other, the courts must decide on the operation of each .... *This is of the very essence of judicial duty.*[56]

House Bill No. 31 states that the General Assembly asserts its "right and prerogative to be the ultimate arbiter of the intent, meaning, and construction of its laws and to vigorously defend them." House Bill No. 31 also establishes specific standards for judicial officers to apply when interpreting or construing Delaware law. Those provisions in House Bill No. 31 attempt to confer upon the General Assembly fundamental judicial powers. Consequently, those provisions in sections 5402 and 5403 of House Bill No. 31 also violate Article IV of the Delaware Constitution.

### *Single Subject and Title Provisions*

◼ House Bill No. 31 is unconstitutional for a third reason: it addresses at least two distinct and separate subjects. The first subject is this Court's November 23, 2004 decision in *Evans v. State*, which House Bill No. 31 purports to declare "null and void." [57] The second subject is the establishment of prospective standards for the judicial interpretation and application of Delaware laws.[58] These constitute two distinct and separate subjects of legislation. The official synopsis of House Bill No. 31 so reflects, by addressing each subject in separate paragraphs:

> This bill declares the case of *Ward T. Evans v. State of Delaware* null and void
>
> ....
>
> The bill also established specific standards for judicial officers to use when interpreting or construing Delaware law.[59]

By combining two distinct and separate subjects in a single bill, House Bill No. 31 violates the single-subject provision of Article II, Section 16 of the Delaware Constitution.[60]

---

**54.** *See State ex rel. Walker v. Harrington*, 27 A.2d 67, 72 (Del.1942) (stating that "the jurisdiction of the Supreme Court is defined in the Constitution and that its jurisdiction cannot be impaired or restricted by language contained in any legislative act").

**55.** *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 222, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995) (quoting The Federalist No. 78 (Alexander Hamilton)).

**56.** *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177–78, 2 L.Ed. 60 (1803) (emphasis added). *See* Robert Lowery Clinton, *Marbury v. Madison and Judicial Review* (University Press of Kansas 1989).

**57.** House Bill No. 31, Section 1, §§ 5401–02.

**58.** House Bill No. 31, Section 2, § 5403.

**59.** House Bill No. 31, Synopsis.

**60.** *Clendaniel v. Conrad*, 83 A. 1036, 1042 (Del.1912) (legislation comprising "two distinct and separate subjects" violates the Single–Subject Provision).

Article II, § 16 of the Delaware Constitution reads as follows: "No bill or joint resolution, except bills appropriating money for public purposes, shall embrace more than one subject, which shall be expressed in its title."[61] The provision that a bill contain only one subject and that the title of the bill express its subject are distinct requirements having different historical origins.[62] Nevertheless, these two requirements are frequently combined in a single provision, such as Article II, § 16 of the Delaware Constitution, to achieve a common purpose.[63]

The potential problem caused by an omnibus bill is an uninformed legislative vote—a problem recognized even by the Romans who, in 98 B.C., enacted the *Lex Caecilia Didia* to prohibit the adoption of laws which contained unrelated provisions—the *lex satura*.[64] The omnibus bill continued to be a cause for concern in colonial America prior to the Revolutionary War.[65] Accordingly, the constitution of nearly every state now contains a general requirement that each legislative act be limited to a single subject.[66]

Almost every state constitution requires that the title of a bill adequately express its subject matter.[67] These "title" provisions are also intended to insure informed

legislative action, as the 1897 debates on the Delaware Constitution reflect:

Oftentimes bills have been introduced in the Legislature with very harmless titles, but amendments have been added to those bills and when they have passed both Houses, they are entirely different from what they were originally.[68]

■ The two general requirements of Article II, § 16 were included in the Delaware Constitution of 1897 in order to "prevent deception of the general public and the members of the General Assembly by titles to bills which give no adequate information of the subject matter of the bills."[69] The single-subject and title provisions in Article II, § 16 are intended to assure sufficient notice that "legislation, the content of which was inadequately brought to the public attention, or so-called sleeper legislation" does not slip through the General Assembly.[70] If a bill contains multiple subjects or the title of the bill would "trap the unwary into inaction," it violates Article II, § 16 of the Delaware Constitution.[71]

House Bill No. 31 graphically illustrates the dangers of an uninformed legislative vote where the title of a bill is inadequate. This Court has always looked to the language of any statute when interpreting its

61. Del. Const. art. II, § 16 (the "Single–Subject Provision").

62. *See* Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, 42 Minn. L.Rev. 389, 391 (1958).

63. *Id.*

64. *See* Luce, *Legislative Procedures* 548–49 (1922).

65. *Id.*

66. Millard H. Ruud, *No Law Shall Embrace More Than One Subject*, XLII Minn. L.Rev. 389, 390 (1958).

67. *Id.*

68. 1 *Delaware Constitutional Debates 1897* 264.

69. *Opinion of the Justices*, 194 A.2d 855, 856 (1963).

70. *Id. See also* Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 91 (2002).

71. *In re the Opinion of the Justices*, 177 A.2d 205, 208 (1962).

provisions.[72] Nevertheless, sections 5403(b) and (c) of House Bill No. 31 provided for judicial officers to "strictly interpret or construe legislative intent" and to "use the utmost restraint in interpreting or construing the laws of this State." House Bill No. 31 provided absolutely no notice, however, that it impacted at *least sixty other statutes* in which the General Assembly stated that those statutes must be *liberally or broadly construed* to accomplish the General Assembly's intent, e.g., Del.Code Ann. tit. 19, § 721 in the Employment Practices Act ("this subchapter shall be liberally construed to promote the full employment opportunity of qualified handicapped persons who seek such opportunity in good faith.").[73]

### House Bill No. 31 Entirely Unconstitutional

■ House Bill No. 31 contains a severability clause, which reads: "If any provision of this Act or the application thereof to any person or circumstance is held invalid, such invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and, to that end, the provisions of this Act are severable." The purpose of the severability clause is to shield from invalidation any constitutional provisions of House Bill No. 31, if other provisions are declared unconstitutional.

Generally, a severability clause is enforceable.[74] *Each* of the separate substantive provisions in sections 5402 and section 5403 of House Bill No. 31, however, violates the requirement of separation of legislative and judicial powers in the Delaware Constitution. Moreover, a severability clause is unenforceable where, as in House Bill No. 31, the legislation collectively violates the single-subject provision in Article II, § 16.[75] If it were otherwise,

**72.** *See Hudson Farms, Inc. v. McGrellis*, 620 A.2d 215, 218–20 (Del.1993).

**73.** *See also* Del.Code Ann. tit. 3, § 929; Del. Code Ann. tit. 3, § 3201; Del.Code Ann. tit. 3, § 9001; Del.Code Ann. tit. 3, § 10213; Del. Code Ann. tit. 5, § 3308; Del.Code Ann. tit. 6, § 1–103; Del.Code Ann. tit. 6, § 2512; Del. Code Ann. tit. 6, § 4201; Del.Code Ann. tit. 6, § 4501; Del.Code Ann. tit. 6, § 4601; Del. Code Ann. tit. 7, § 6020; Del.Code Ann. tit. 7, § 6404; Del.Code Ann. tit. 7, § 6423; Del. Code Ann. tit. 7, § 6501; Del.Code Ann. tit. 7, § 6619; Del.Code Ann. tit. 7, § 8001; Del. Code Ann. tit. 9, § 7001; Del.Code Ann. tit. 10, § 902; Del.Code Ann. tit. 10, § 1053; Del.Code Ann. tit. 10, § 1902; Del.Code Ann. tit. 10, § 6512; Del.Code Ann. tit. 10, § 7102; Del.Code Ann. tit. 10, § 9905; Del.Code Ann. tit. 11, § 2548; Del.Code Ann. tit. 11, § 4358; Del.Code Ann. tit. 11, § 6502; Del.Code Ann. tit. 11, § 6571; Del.Code Ann. tit. 12, § 2357; Del.Code Ann. tit. 12, § 4002; Del.Code Ann. tit. 13, § 401; Del.Code Ann. tit. 13, § 1502; Del.Code Ann. tit. 14, § 8201; Del.Code Ann. tit. 14, § 8213; Del.Code Ann. tit. 14, § 9201; Del.Code Ann. tit. 16, § 921; Del.Code Ann. tit. 16, § 1421; Del.Code Ann. tit. 16, § 5201; Del.Code Ann. tit. 16, § 6101; Del.Code Ann. tit. 17, § 426; Del.Code Ann. tit. 18, § 3701; Del.Code Ann. tit. 18, § 4204; Del.Code Ann. tit. 18, § 4404; Del.Code Ann. tit. 20, § 3130; Del.Code Ann. tit. 21, § 2602; Del.Code Ann. tit. 21, § 8101; Del.Code Ann. tit. 22, § 1712; Del.Code Ann. tit. 22, § 1714; Del.Code Ann. tit. 22, § 1812; Del.Code Ann. tit. 22, § 1901A; Del.Code Ann. tit. 24, § 2501; Del. Code Ann. tit. 24, § 5501; Del.Code Ann. tit. 25, § 7001; Del.Code Ann. tit. 26, § 801; Del.Code Ann. tit. 29, § 2517; Del.Code Ann. tit. 29, § 5067; Del. Code Ann. tit. 29, § 9007A; Del.Code Ann. tit. 31, § 381; Del. Code Ann. tit. 31, § 3601; Del.Code Ann. tit. 31, § 3821; Del.Code Ann. tit. 31, § 4002; Del.Code Ann. tit. 31, § 4014; Del.Code Ann. tit. 31, § 5203.

**74.** *See, e.g., Stiftel v. Malarkey*, 384 A.2d 9 (Del.1977).

**75.** *Clendaniel v. Conrad*, 83 A. 1036, 1042 (Del.1912) (legislation comprising "two distinct and separate subjects" violates the Single–Subject Provision). *See also Heggs v. State*, 759 So.2d 620 (Fla.2000); *Senate of Cal. v. Jones*, 21 Cal.4th 1142, 90 Cal.Rptr.2d 810, 988 P.2d 1089 (1999); *Litchfield Elementary Sch. Dist. v. Babbitt*, 125 Ariz. 215, 608 P.2d 792 (App.1980).

the policy considerations served by the single-subject provision would be seriously undermined.[76] Accordingly, the severability clause does not shield any of the substantive provisions of House Bill No. 31 from invalidation.

### House Bill No. 31 Inoperative

■■■■■ The State argues that "irrespective" of House Bill No. 31's constitutionality, this Court should consider it as a "clear declaration of legislative intent in the original act." That we cannot do. In *Marbury v. Madison,* the United States Supreme Court held "[i]t is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it."[77] Therefore, "an act of the legislature, repugnant to the constitution, is void."[78] After so concluding in *Marbury,* Chief Justice Marshall then asked the following questions:

If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect? Or, in other words, though it be not law, does it constitute a rule as operative as if it was a law?[79]

The answer in *Marbury v. Madison* was a "resounding no."[80] To conclude otherwise would, in Chief Justice Marshall's words "subvert the very foundation of all written Constitutions ... to restrict [legislative] powers within narrow limits."[81]

Chief Justice Marshall's stirring answer is equally applicable here. House Bill No. 31 is unconstitutional in its entirety. Therefore, under *Marbury v. Madison,* it is void and can have no effect in our reconsideration of our November 23, 2004 decision issued in this case.

### Evans' Issue on Appeal

We next turn to the issue presented by Evans' appeal, which is whether his life sentence is for the term of his natural life (unless parole is granted), or for a term of forty-five years. The resolution of that question requires an overview of Delaware's statutory sentencing system.

### Original Statutory Sentencing System

■■■ The sentencing provisions of the Delaware criminal justice system appear in several different statutes, many of which were originally enacted separately and then amended on numerous occasions over the last few decades. Courts must read all of those statutes, as amended, *in pari materia* to interpret and give effect to the statutory sentencing scheme in operation at any given point in time.

In 1964, the General Assembly enacted sections 4346 and 4348 of Title 11. Section 4346 is entitled Eligibility for Parole. Subsection (a) provides: "A person confined to any correctional facility administered by the Department may be released on parole by the Board if the person has served 1/3 of the term imposed by the court, such term to be reduced by such merit and good behavior credits as have been earned, or 120 days, whichever is greater."[82] Subsection (c) also provides,

**76.** Millard H. Ruud, *No Law Shall Embrace More than One Subject,* 42 Minn. L.Rev. 389, 399 n. 8 (1958).

**77.** *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

**78.** *Id.*

**79.** *Id.*

**80.** *Id.*

**81.** *Id.* at 178.

**82.** Section 4346 provides in relevant part:
(a) A person confined to any correctional facility administered by the Department may be released on parole by the Board if the person has served ⅓ of the term imposed by the court, such term to be reduced

in part: "For all purposes of this section, a person sentenced to imprisonment for life shall be considered as having been sentenced to a fixed term of 45 years."

Section 4348 of Title 11, which is entitled "Release Upon Merit and Good Behavior Credits" provides, in pertinent part: "A person having served that person's term or terms in incarceration, less merit and good behavior credits as having been earned, shall, upon release, be deemed as released on parole until the expiration of the maximum term or term for which the person is sentenced." This Court has recognized that, insofar as the terms and conditions of non-custodial status are concerned, there is little practical difference between release on parole under section 4346 and conditional release under section 4348.[83]

■ Prior to 1990, an *eligible* inmate could obtain early release in two ways: from the Parole Board under section 4346(a) or by conditional release pursuant to section 4348.[84] *Release of an inmate on parole under section 4346 is a matter of discretion for the Parole Board. Conditional release under section 4348, however, is non-discretionary.* If an inmate who is eligible for conditional release has accumulated sufficient good behavior and merit credits, he or she must be released from incarceration on his or her short-term release date, *i.e.,* the maximum period of incarceration less accumulated good behavior and merit credits.[85]

### Truth–in–Sentencing Act

The most comprehensive legislative revision of the Delaware statutory sentencing system was the Truth–in–Sentencing Act of 1989, which became effective in 1990. Under the Truth–in–Sentencing Act, a sentence of Level V incarceration for any crime committed after June 29, 1990 is no longer subject to the parole provisions of section 4346. That is, beginning in 1990, the General Assembly prospectively abolished parole as a basis for early release from Level V incarceration for any post-June 29, 1990 crime.[86]

Although the 1989 Truth–in–Sentencing Act *completely eliminated parole* for crimes committed after its effective date, that statutory enactment continued generally to *permit conditional release* for good time credit. The Truth–in–Sentencing Act thus provides that: "All sentences imposed for any offenses other than a life sentence imposed for class A felonies *may be reduced* by earned good time under the provisions of this section and rules and regulations adopted by the Commissioner of Corrections."[87] Thus, for crimes committed after June 29, 1990, the reduction of a sentence by earned good time would result in conditional release under section 4348 for eligible inmates.

### Jackson Decision

In *Jackson*, this Court confronted the same question that is presented by Evans on this appeal. Jackson, like Evans, was sentenced to life imprisonment, with the possibility of parole, before the enactment

---

by such merit and good behavior credits as have been earned, or 120 days, whichever is greater. For the purpose of this subchapter, "court" shall include any court committing an offender to the Department.

**83.** *Jackson v. Multi–Purpose Criminal Justice Facility,* 700 A.2d 1203, 1206 (Del.1997).

**84.** *Id.*

**85.** *Id.*

**86.** *Robinson v. State,* 584 A.2d 1203 (Del. 1991) ("The Truth–in–Sentencing Act was never intended by the Delaware General Assembly to have a retroactive effect.").

**87.** Del.Code Ann. tit. 11, § 4381(a).

of Truth–in–Sentencing. The issue presented in *Jackson* was whether an inmate who is serving a life sentence with the possibility of parole is entitled to conditional release by the Department of Correction under Del.Code Ann. tit. 11, § 4348.

Jackson was sentenced in 1973 to two concurrent life terms in prison, with the possibility of parole, for Kidnapping in the First Degree and Rape in the First Degree. After his application for parole was denied in 1995, Jackson filed a petition for a writ of mandamus in the Superior Court. Jackson claimed that the Department of Correction was required to set a conditional, or "short-term," release date for him under section 4348.

It was undisputed that for the purpose of determining Jackson's parole eligibility, the Parole Board was required to treat his life sentence as a fixed term of forty-five years.[88] Jackson argued, however, that the Department of Correction also was required to treat his life sentence as a fixed term of forty-five years for purposes of calculating a conditional release date. That is, Jackson, like Evans, asserted that, even if the Board denied him parole under section 4346, he was still entitled to conditional release by the Department of Correction under section 4348. In *Jackson*, we rejected that argument, and held that an inmate who is serving a life sentence with the possibility of parole is not entitled to conditional release under section 4348.[89] We stated that, if the General Assembly had intended to permit those inmates serving life sentences with the possibility of parole to be eligible for conditional release

under section 4348, it would have expressly so stated in the statute.[90]

### *Crosby Decision*

In *Crosby*, this Court concluded that the General Assembly had made such an express statement when it enacted the Truth–in–Sentencing legislation. The General Assembly did that in cases of non-violent habitual offenders sentenced to life under section 4214(a), because any sentence imposed under section 4214(a) was made specifically subject to the provisions of section 4381 in the same Truth–in–Sentencing enactment. Thus, section 4381(a) provided that "*all* sentences imposed for *any* offense, other than a life sentence imposed for class A felonies, *may be reduced* by earned good time under the provisions of this section and rules and regulations adopted by the Commissioner of Corrections." Although the General Assembly created classifications for felonies when it adopted the Truth–in–Sentencing Act, it did not reclassify section 4214(a) life sentences for habitual offenders as life sentences for "class A felonies," which are carved out from the "earned good time" provision of section 4381(a).

In *Crosby*, we "examine[d] the amendments that were made to the habitual offender statute as part of the Truth–in–Sentencing Act to ascertain the General Assembly's [then] current intent with regard to a section 4214(a) life sentence."[91] The history of Delaware's habitual offender statute reflects that the General Assembly drew a distinction between a habitual offender designation under section 4214(a) and an habitual offender status under section 4214(b). In 1970, before the Truth–

88. *Jackson v. Multi–Purpose Criminal Justice Facility,* 700 A.2d 1203 (Del.1997). *See* Del. Code Ann. tit. 11, § 4346(c).

89. *Jackson v. Multi–Purpose Criminal Justice Facility,* 700 A.2d at 1205.

90. *Id.* at 1207 (citing *State v. Skinner,* 632 A.2d 82, 86 (Del.1993)).

91. *Crosby v. State,* 824 A.2d 894, 900 (Del. 2003).

in–Sentencing Act was passed, a person serving a life sentence under section 4214(a) could receive the benefit of parole, and for that purpose a life sentence would be considered a fixed term of forty-five years. A person serving a life sentence imposed under subsection 4214(b), however, was not eligible for parole.

When Truth–in–Sentencing was enacted, the General Assembly retained the distinction first made in 1970 between habitual offenders who were serving life sentences under section 4214(a) and under section 4214(b), respectively. After the passage of the Truth–in–Sentencing Act, persons sentenced to life as habitual offenders under section 4214(a) were not eligible for release on parole. Such persons were still eligible for conditional release under section 4348, however, because subsection (a) specifically incorporated section 4381 by reference. The General Assembly accomplished its intention to provide for sentence reduction through the accumulation of good time credit by continuing to treat a life sentence imposed under section 4214(a) in the Truth–in–Sentencing Act as a fixed term of 45 years.[92]

In *Crosby*, we determined that, when the Truth–in–Sentencing Act was adopted, the General Assembly intended to treat a person sentenced to life under section 4214(a) differently from persons who received other life sentences,[93] by making that person eligible for conditional release. That intent, we held, was clearly reflected in all of the General Assembly's carefully crafted statutes and amendments. The General Assembly accomplished that intent by not repealing section 4346(c) and by continuing to treat a life sentence for an habitual offender under section 4214(a) as a fixed term of forty-five years under section 4346(c). Therefore, in *Crosby* we held that a person sentenced to life as an habitual offender pursuant to section 4214(a) is to be "considered as having been sentenced to a fixed term of 45 years," and qualifies for conditional release pursuant to section 4348, based upon good time credits earned pursuant to section 4381.[94]

**92.** Accordingly, in *Crosby*, the sentencing judge stated that Delaware law equates Crosby's life sentence, as an habitual offender under title 11, section 4214(a) of the Delaware Code, to a fixed term of forty-five years. In fact, Crosby's life sentence was based on the trial judge's belief that Crosby would be "eligible for a significant sentence diminution by earning good time." The SENTAC Benchbook recognized that explicitly:

> Habitual criminal status, is not, per se, a class A offense, but is declared on petition from the Attorney General. If declared under Section 4214(a) may receive a sentence of UP TO LIFE imprisonment at Level V, such sentence being subject to "good time credit" but no other form of diminution or suspension. If declared under section 4214(b), the sentence is LIFE without suspension, probation or any other form of diminution.

Delaware Sentencing Accountability Commission Benchbook 21 (2003). Therefore, the sentencing judge concluded that the availability of earning good time credit meant that Crosby would be eligible for conditional release before the expiration of the sentence, *i.e.*, before the end of Crosby's natural life. The sentencing judge stated that "was a factor I took into account."

**93.** At the time *Crosby* was decided, a life sentence under section 4214(a) of the habitual offender statute was unique in comparison to the General Assembly's statutory scheme for other life sentences. It differed by express statutory language from any of the following types of life sentences: "A life sentence for murder in the first degree is 'life without benefit of probation or parole or any other reduction.' A life sentence for a class A felony is not subject to the statute authorizing the award of good time. A life sentence for a three-time violent offender is not subject to the probation or parole of Title 11, Chapter 43, which includes § 4381."

**94.** *Crosby v. State*, 824 A.2d 894, 900–02 (Del. 2003) (citations omitted).

Following our decision in *Crosby*, the Attorney General's Office asked the General Assembly to change the law.[95] Even though less than 5% of criminal appeals are reversed by this Court, such requests have become a routine practice.[96] The habitual offender provisions that were originally enacted in section 4214(a) as part of the Truth–in–Sentencing Act and construed in *Crosby* were amended in 2004. Those 2004 amendments to section 4214(a) are not an issue in this appeal, and play no role in our resolution of the issue presented here.

### *Broad Statements in* Crosby *Caused Confusion*

Because Jackson was sentenced to life with the possibility of parole in accordance with statutes adopted before the 1989 enactment of the Truth–in–Sentencing Act, Jackson's natural life sentences were not affected by that legislation. Crosby, however, was sentenced to life under section 4214(a) of the Truth–in–Sentencing legislation. Unfortunately, in explaining how the Truth–in–Sentencing statute operated in Crosby's case, this Court discussed pre-Truth-in-Sentencing aspects of our *Jackson* opinion in terms that were unnecessary to our holding in *Crosby*.

Our decisions in *Crosby* and *Jackson* both involved an application of the good time credit statute, but to different types of life sentences: in *Jackson*, a life sentence for specific *pre–1990 violent* crimes and in *Crosby*, a life sentence for *post–1990 non-violent* habitual offenders. As earlier noted, section 4346(c) treated a life sentence as a fixed term of forty-five years for purposes of determining parole eligibility in cases involving pre-Truth-in-Sentencing *parole eligible* life sentences for violent crimes—*i.e. Jackson*.[97] For those life sentences, good time credit was earned only for the purpose of accelerating the date of parole eligibility, but *never* for purposes of conditional release.[98]

Section 4346(c), on the other hand, applied to post-Truth-in-Sentencing section 4214(a) life sentences for non-violent habitual offenders, who were never eligible for parole but were eligible for *conditional release* under section 4348 by the sentence reduction provisions of Truth–in–Sentencing Section 4381—*i.e. Crosby*.[99] For those life sentences, good time credit was earned only for the purpose of accelerating the date of conditional release, but *never* for purposes of parole.

In *Crosby*, we held that under the Truth–in–Sentencing statute, a life sentence meant a term of forty-five years *but only* for section 4214(a) non-violent habitual offenders. That was because the new Truth–in–Sentencing section 4381 had been incorporated into the new section 4214(a) provision of the Truth–in–Sentenc-

---

**95.** The Committee Findings of the House of Representatives state:

A representative from the Attorney General's office explained that there has been ambiguity in regards to a sentence of life in prison. In the past, life in prison could mean 45 years and not an entire natural life in prison. He stated that this bill makes it clear that a life sentence means that the individual will be incarcerated for the rest of their natural life and will not have the option of parole or any reduction in time served.

**96.** The percentage of criminal appeals reversed by the Delaware Supreme Court are set forth each year in the Annual Statement Report of the Delaware Judiciary. For the past few years, the reversal rates in criminal appeals were: 3.4% (2004); 3.8% (2003); and 4.9% (2002).

**97.** *Jackson v. Multi–Purpose Criminal Justice Facility,* 700 A.2d 1203 (Del.1997).

**98.** *Id.*

**99.** *Crosby v. State,* 824 A.2d 894 (Del.2003).

ing statute. In this statutory setting, the references in *Crosby* to the operation of section 4346 and section 4348 upon the pre-Truth-in-Sentencing life sentences with the possibility of parole for violent crimes, were overbroad and unnecessary to our holding. That *obiter dicta* in *Crosby* is what caused the initial confusion in this case.

When *Jackson* was decided in 1997, we stated that section 4348 did not apply to *any* life sentence. That statement was also overbroad. In *Jackson*, we should have more accurately stated that section 4348 did not apply to any life sentence with the possibility of parole that was *imposed before the effective date of Truth–in–Sentencing*. That qualification is important, because the Truth–in–Sentencing statute did make the conditional release provisions in section 4348 applicable to a life sentence imposed after 1990 under section 4214(a). Thus, "to the extent" we stated that *Jackson* was overruled by *Crosby*, it was only to the extent that the unqualified reference in *Jackson* to "*any* life sentence" was overbroad and was not limited to the issue presented by *Jackson:* pre-Truth-in-Sentencing life sentences with the possibility of parole.

### Jackson Controls Evans

■ We have concluded that the cases of *Jackson* and *Crosby* were both decided correctly. We have also determined that *Evans* is controlled by *Jackson* rather than *Crosby*. Evans' life sentence was—like Jackson's life sentence—a natural life sentence with the possibility of parole. Evans' life sentence was not—like Crosby's life sentence—equivalent to a fixed term of forty-five years.

In deciding to reconsider this matter, we asked the State to produce copies of Ev-

ans' records at the Department of Correction. Evans' records confirm that his sentence was for life with the possibility of parole. When Evans was originally sentenced, his records at the Department of Correction read: sentence—life; release—death; and parole eligibility—eleven years five months nine days.

The Department of Correction records reflect that Evans' status has always been consistent with our interpretation of the applicable sentencing statutes in *Jackson*. Evans' release date was death, *unless* he was granted parole. For purposes of *parole eligibility only*, Evans' life sentence was computed as a term of forty-five years. Evans was eligible for parole after serving one third of forty-five years and could accelerate his parole eligibility date by earning good time credit.[100]

When Evans was sentenced to life with the possibility of parole, the statutory sentencing system did not permit Evans to be released prior to his death—unless parole was granted. Similarly, good time credits only applied to Evans' natural life sentence for purposes of accelerating Evans' parole eligibility date. Accordingly, we hold that Evans—like Jackson—is not eligible for conditional release and must remain incarcerated until his death, unless he is granted parole.[101]

### Conclusion

The opinion issued by this Court on November 23, 2004 is withdrawn and shall have no force or effect. House Bill No. 31 is unconstitutional in its entirety. The judgment of the Superior Court in Evans' case is affirmed.

---

100. *Stirparo v. State,* 297 A.2d 406 (Del.Super.Ct.1972).

101. *Jackson v. Multi–Purpose Criminal Justice Facility,* 700 A.2d 1203 (Del.1997).