**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

AHMED AL BALOOSHI,      )
        )
     Plaintiff,     )
        )
     v.      )     C.A. No. N19C-10-215 CEB
        )
GVP GLOBAL CORP.,     )
        )
     Defendant.     )

Submitted:  November 29, 2021
Decided: February 25, 2022

**POST-TRIAL MEMORANDUM OPINION**

R. Eric Hacker, Esquire, MORRIS JAMES LLP, Wilmington, Delaware. *Attorney for Plaintiff Ahmed Al Balooshi*.

Kevin S. Mann, Esquire, and David G. Holmes, Esquire, CROSS & SIMON, LLC, Wilmington, Delaware. *Attorneys for Defendant GVP Global Corp*.

**BUTLER, R.J.**

Plaintiff Ahmed Al Balooshi was retained as a financial advisor by Defendant GVP Global Corp. ("GVPGC" or the "Company") to assist in raising startup capital for one of the Company's venture funds, Ames Street Capital Corp I LP (the "Fund"). Balooshi brought this breach-of-contract action against the Company to recover some of his unpaid compensation. Having considered all the evidence presented at trial, the Court finds that GVPGC breached its payment obligations and failed to prove any of its defenses to the breach. Accordingly, the Court will enter judgment in Balooshi's favor for $130,221.51, plus rule-based costs, and pre- and post-judgment interest. The Court, however, does not find attorney's fee-shifting to be warranted in this case. Balooshi's award will not include his attorney's fees.

## FACTUAL FINDINGS

The parties conducted a two-day bench trial during which they introduced live testimony from two witnesses—Balooshi and GVPGC's founder and president, David Billings—and documentary evidence contained in a joint appendix.[1] After trial, the parties filed supplemental briefing. The Court has considered the entire record but limits its findings to those relevant to Balooshi's claim and the

---

[1] Where appropriate, the Court will cite to specific items in the record, including documents contained in the appendix ("JX[#]").

Company's defenses. The following facts were proven by a preponderance of the evidence.[2]

## A. GVPGC Retains Balooshi

Balooshi and Billings met while Balooshi was working as an investment banker. At the time, Billings was planning one of the Fund's first equity offerings. Billings wanted to launch the Fund through a private placement targeted primarily at investors active in Middle East capital markets. Balooshi, a Bahraini citizen, told Billings about his connections to investors located in the Gulf countries. After a few conversations, Billings hired Balooshi to spearhead the Fund's promotional efforts, strengthen the Fund's marketability, and recruit investors from the Middle East.

## B. The Parties Execute the Agent Agreement and the NDA

The parties memorialized their relationship in two agreements: a retainer agreement (the "Agent Agreement")[3] and a confidentiality agreement (the "NDA").[4] The Agent Agreement outlined Balooshi's responsibilities and set the rate and terms of his compensation. The NDA governed Balooshi's disclosure and use of

---

[2] The preponderance of the evidence standard governs contract claims and defenses. *E.g.*, *Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at \*16 (Del. Ch. July 30, 2021). Using that standard, the Court resolved competing testimony and exhibits by crediting "the side [with] 'the greater weight of the evidence.'" *Taylor v. State*, 2000 WL 313501, at \*2 (Del. Feb. 23, 2000) (quoting *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967)).
[3] JX18 (hereinafter "Agent Agreement").
[4] JX5 (hereinafter "NDA").

GVPGC's proprietary information and his ability to compete with the Company. The Company drafted both agreements and rejected Balooshi's attempts to renegotiate their relevant terms.

## 1. Relevant Terms in the Agent Agreement

### a. Background Provisions

The Agent Agreement contemplated a three-year term effective as of May 8, 2017 that could have been terminated earlier upon written notice from either party.[5] During its life, the Agent Agreement tasked Balooshi with several "functions" that reduced fundamentally to making "investment referrals" and "assisting in [the] process" of securing investments for the Fund.[6]

Separately, the Agent Agreement included a severability clause. The severability clause provides that the Agent Agreement should be enforced on its valid terms even if one or more of its terms are deemed invalid.[7]

### b. Payment Provisions

The Agent Agreement structured Balooshi's compensation as two forms of income. First, the Company agreed to pay Balooshi a flat fee of $15,000 per month (the "Flat Fee").[8] The Flat Fee operated as a salary. It was not subject to audit or

---

[5] Agent Agreement at 3.
[6] *Id.* at 1.
[7] *Id.* at 3, 9.
[8] *Id.* at 13.

conditioned on achieving specific results. At the end of each month, Balooshi would send GVPGC an invoice that billed the Flat Fee plus any reasonable expenses he incurred over a given period. Balooshi agreed to front those expenses and the Company agreed to reimburse them within 30 days after it received notice.[9]

Second, the Company agreed to pay Balooshi an incentive-based contingent fee (the "Referral Fee").[10] The Referral Fee operated as a commission, priced using a 3% benchmark that was subject to post-execution adjustments per unspecified "laws and regulations."[11] As a commission, the Company had no obligation to remit the Referral Fee unless (i) Balooshi personally referred an investor; (ii) the Company found the investor acceptable; and (iii) the investment closed.[12] Unlike the Flat Fee, the Referral Fee was tied to the Fund's success. Stated conversely, even if Balooshi failed to earn a Referral Fee—*i.e.*, did not raise any money for the Fund—he would remain entitled to the Flat Fee and his reasonable expenses.

## 2. Relevant Terms in the NDA

The Company also required Balooshi's consent to the NDA, which was executed contemporaneously with, and incorporated into, the Agent Agreement.[13] The NDA barred Balooshi from using GVPGC information and intellectual property

---

[9] *Id.*
[10] *Id.* at 11.
[11] *Id.*
[12] *Id.* at 5, 12–13.
[13] *Id.* at 2.

5

for his personal advantage.[14] It also barred Balooshi from steering business opportunities with certain individuals and entities away from GVPGC. Those individuals and entities were named in a no-contact list that was attached to the NDA.[15] The NDA provided its own breach remedies, however, and so any violation did not purport to excuse the Company's obligations under the Agent Agreement.[16]

## C. Balooshi Assists GVPGC with Marketing the Fund to Potential Investors

Months before the Agent Agreement was fully executed, Balooshi redrafted the Fund's marketing materials to align them with industry norms and foreign investors' preferences.[17] Next, he tapped his professional contacts in the Gulf. Having deployed his contacts, Balooshi then traveled to the Gulf to network with potential investors. Throughout this time, Balooshi updated GVPGC on his progress and recommended strategies for preventing the Fund from losing momentum or appearing too risky.

Balooshi delivered. After his return, Balooshi arranged a week-long business trip to the Middle East that the parties called the "Road Show." The Road Show involved 12 live presentations during which GVPGC management used Balooshi's

---

[14] *E.g.*, NDA §§ 5–7, 11–12.

[15] *Id.* at Exs. A–B.

[16] *Id.* § 13.

[17] *E.g.*, JX9, JX100–03. In apparent recognition of Balooshi's early work, the Company made the Agent Agreement, which was executed in October 2017, retroactive to May 2017, *i.e.*, when Balooshi was hired. Agent Agreement at 1.

revised marketing materials to pitch the Fund to various institutional and royal investors across the United Arab Emirates, Saudi Arabia, Bahrain, and Oman.[18] To further support the Road Show, Balooshi booked the parties' accommodations and flights, created daily itineraries and meeting agendas, held team debriefings between conference dates, and recruited a local aide to schedule events.

In the end, the Road Show did not result in any investments. But the Company still considered it a success. Billings praised Balooshi for organizing the Road Show in written communications to the Company's stakeholders. The Company never claimed that Balooshi performed deficiently or failed to perform at all.

After the Road Show concluded, Balooshi maintained contact with the Gulf investors. He distributed reports to GVPGC that tracked their engagement levels. He proposed methods for sustaining their interest. And he continued to develop ideas for marketing the Fund abroad. These initiatives were discussed during routine office calls between Balooshi and GVPGC management. Neither during those calls nor any time else did the Company criticize Balooshi's work or redirect it.

## D. The Parties Explore Vektor Vodka

While retained, Balooshi learned of Native Spirits Limited, LLC, an alcohol manufacturer. Native had been considering a new product line, "Vektor Vodka," and needed investments to launch the brand. In due course, Native offered to retain

---

[18] JX51.

Balooshi to secure some of those investments. Balooshi was interested, but recognized his obligations to the Fund. So he presented Vektor to GVPGC.

The Company showed interest too. Billings intended to introduce Vektor to his contacts in China. Billings also authorized Balooshi to pursue a GVPGC stakeholder, William Eckholm, for a contribution. Given the Company's increasing involvement, Balooshi drafted a profit-sharing agreement through which the Company would collect a percentage of Balooshi's commissions on Vektor investments.[19] It is not clear if that agreement ever was formalized. But it is clear that (1) neither Native nor Eckholm was named in the NDA's no-contact list; and (2) GVPGC knew about Vektor and participated in or encouraged Balooshi's assistance.

### E. GVPGC Fails to Pay Balooshi

In October 2017, the Company missed its first Flat Fee and expense payments. Then it missed all the rest. The Company did make some untimely payments. But even those were sent irregularly and never made the Company's account current.

The Company did not defend its defaults on the ground that Balooshi was in breach of the Agent Agreement or the NDA. Instead, the Company explained that it could not make its payments on time or predictably until it obtained working capital from the Fund and unrelated projects. In other words, the Company blamed

---

[19] JX37.

its own insolvency for its defaults, not Balooshi's performance. Despite the Company's repeated failure to meet its payment obligations, Balooshi continued working and sending his invoices until the Agent Agreement terminated.

Balooshi kept an itemized spreadsheet that summarized the Company's outstanding balance and sporadic payments.[20] The entries reflected: $195,765.60 in Flat Fee and expense charges, minus $65,544.09 in belated and intermittent payments, for a total of $130,221.51 in unpaid compensation and reimbursements. The Company has never disputed that figure.

## F. GVPGC Terminates the Agent Agreement

The Company terminated the Agent Agreement on May 2, 2018, through an e-mail from Billings to Balooshi.[21] As a basis for termination, Billings cited a lack of "actual results."[22] He also raised previously unknown concerns with Balooshi's role at Vektor. According to Billings, Balooshi violated the NDA by "using [his] contacts to raise capital" for Vektor without the Company's permission.[23]

On May 28, 2018, Balooshi sent a final invoice to GVPGC that demanded the $130,221.51 in unpaid Flat Fees and expenses.[24] The Company did not respond.

---

[20] JX93.

[21] The Company produced two iterations of the termination e-mail. *See* JX65, 97. Although Balooshi disputes the e-mail's legitimacy, *see infra* Relief Awarded § 2, he agrees that the Agent Agreement terminated in May 2018.

[22] JX65.

[23] *Id.*

[24] JX63.

9

Balooshi reasserted his demand three times.[25]  The Company did not respond to those demands either.

## G.  Balooshi Sues

On October 25, 2019, Balooshi filed a one count complaint against the Company that alleged a breach of contract based on GVPGC's failure to pay all his Flat Fees and expenses.  He sought as damages the unpaid $130,221.51 balance, plus rule-based costs, and pre- and post-judgment interest.  He also sought his attorney's fees under the bad faith exception to the American Rule.  He did not seek, or ever claim that he earned, a Referral Fee.

Before litigation, the Company never claimed that Balooshi performed inadequately or that the parties' contracts were void.  Once sued, however, the Company changed its tune.

GVPGC, through its former counsel, filed an answer.  The answer did not assert any counterclaims.  Instead, it raised two "affirmative defenses:" "[b]reach of fiduciary duty" and "[f]ailure to perform as obligated under the contract."[26]  Over time, the Company's defense evolved.  At the close of discovery, the Company moved for summary judgment on the theory that the Agent Agreement was void as illegal because it mandated securities broker-dealer activities for which Balooshi

---

[25] JX92–94.

[26] D.I. 5 ¶¶ 47–48 (Ans.).

was not registered. Even later, the Company asserted an implied covenant of good faith and fair dealing defense.

The Court denied the Company's summary judgment motion. After the motion was denied, the Company's trial counsel entered an appearance. Through its new counsel, the Company stipulated to five "issues of fact and law" that the parties' would present during trial: (1) whether GVPGC breached the Agent Agreement; (2) the amount of damages Balooshi suffered as a result of any breach; (3) whether Balooshi breached the Agent Agreement by failing to perform; (4) whether Balooshi breached his fiduciary duties under the NDA, and if so, how the breach impacts any damages Balooshi proves; and (5) whether the Agent Agreement is void for requiring Balooshi to engage in illegal securities activities.[27] The Court used these stipulations as a guide for reaching the conclusions below.

## LEGAL CONCLUSIONS

Resolving this case requires the Court to interpret the parties' contracts. Delaware law governs both contracts.[28] Under Delaware law, the principles of contract interpretation are well-established and grounded on the parties' objective

---

[27] D.I. 47 § 3 (Pre-Trial Stip.).

[28] NDA § 15(A). The Agent Agreement designated the "laws of the District of Delaware" as the parties' choice of law for interpretive issues. Agent Agreement at 9. The District of Delaware is a federal court, not a regime of substantive contract law. But because federal courts sitting in diversity apply state law to contract disputes, the Court has construed this provision as a Delaware choice of law clause.

11

intent at the time of contracting as expressed by the plain language contained within their agreement's four corners.[29]  The Court construes a contract as a whole, giving purpose to each provision.[30]  And the Court accords a contract's "clear and unambiguous terms . . . their ordinary meaning."[31]  "A court must accept and apply the plain meaning of an unambiguous term . . . insofar as the parties would have agreed *ex ante*."[32] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[33]

"Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it."[34]  Ambiguity exists only if a term "is fairly or reasonably susceptible of more than one meaning."[35]  So a contract "is not ambiguous simply because the parties disagree on its meaning."[36]  "Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to

---

[29] *E.g.*, *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016).

[30] *E.g.*, *Elliott Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

[31] *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 696 (Del. 2019) (internal quotation marks omitted).

[32] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

[33] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).

[34] *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).

[35] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[36] *E.I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 693 A.2d 1059, 1061 (Del. 1997).

enforce the agreement as written."[37] "It is not the court's role to rewrite the contract . . . [or] allocat[e] the risk of an agreement after the fact . . . ."[38]

"Where a contract is ambiguous, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions."[39] If a contract is ambiguous, then the Court may consider extrinsic evidence of its meaning.[40] But even when extrinsic evidence is admissible, the Court cannot rely on it unless it "speak[s] to the intent of *all* parties to a contract."[41] If extrinsic evidence fails to forge "some connection between the expectations of the contracting parties . . . and the way the contract terms were articulated by those parties[,]" then the evidence "provides an incomplete guide with which to interpret contractual language."[42]

The prevailing contract interpretation must be reasonable.[43] A contract interpretation is reasonable when the contract language is "read in full and situated

---

[37] *Glaxo Grp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).

[38] *Wal–Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 624 (Del. Ch. 2005), *rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006).

[39] *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (internal quotation marks omitted).

[40] *E.g.*, *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 (Del. 2019).

[41] *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998).

[42] *Id.*

[43] *See, e.g.*, *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." (internal quotation marks omitted)).

in the commercial context between the parties."[44] Even so, "background facts cannot be used to alter the language chosen by the parties within the four corners of their agreement."[45] "[I]t is not the job of a court to relieve . . . parties of the burdens of contracts they wish they had drafted differently but in fact did not."[46]

## A. GVPGC Breached the Agent Agreement

Balooshi sought to prove that the Company breached the Agent Agreement. To prove a breach of contract, the plaintiff must demonstrate by a preponderance of the evidence (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damage.[47] As explained below, Balooshi proved his claim. The Company had a duty to pay Balooshi his Flat Fees and to reimburse his expenses. It breached its obligations by failing to pay either balance fully. And its breach caused Balooshi to suffer $130,221.51 in damage.

### 1. The Company had contractual obligations to pay Balooshi.

There was no serious dispute that GVPGC had payment duties under the Agent Agreement. The Agent Agreement imposed a duty on GVPGC to pay Balooshi the Flat Fee at the end of each month. And it imposed a duty on GVPGC

---

[44] *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co. LLC*, 166 A.3d 912, 926–27 (Del. 2017); *accord OptiNose AS v. Currax Pharms., LLC*, 264 A.3d 629, 638 (Del. 2021).

[45] *Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 820 (Del. 2018).

[46] *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

[47] *E.g.*, *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

14

to reimburse Balooshi's expenses within 30 days after receiving notice of them. There was nothing ambiguous about these obligations. Accordingly, Balooshi proved GVPGC had a contractual duty to pay him the amounts he sought.

### 2. The Company breached its payment obligations.

There also was no serious dispute that GVPGC did not pay Balooshi all the Flat Fees and expenses that came due. Balooshi's spreadsheet tabulated $195,765.60 in charges from May 2017 to May 2018. The Company accepted that balance and paid $65,544.09 toward the total, but eventually explained that it lacked the working capital to settle the remainder. The Agent Agreement, however, required timely and full payment and did not permit GVPGC to delay payment or to underpay without penalty. Accordingly, Balooshi proved that GVPGC breached its payment duties by failing to pay him all he was owed.

### 3. The Company's breach caused damage to Balooshi.

Finally, Balooshi proved that the Company's breach caused him monetary damages. Subtracting the Company's payments from the overall balance, Balooshi remains owed $130,221.51. The Company did not dispute this net amount or the basis for its calculation. Accordingly, the Court finds that the Company's breach caused Balooshi $130,221.51 in damage.

In sum, Balooshi proved his claim. The question now becomes whether GVPGC proved any of its defenses to its breach. For the reasons below, it did not.

**B. GVPGC Failed to Prove Its Defenses**

GVPGC breached the Agent Agreement. The Company tried to resist this straightforward conclusion by advancing a barrage of unsuccessful defenses.

**1. Balooshi did not breach the Agent Agreement.**

The Company first sought to prove that Balooshi materially breached the Agent Agreement by "utterly fail[ing] to . . . [do] anything."[48] Overwhelming evidence showed otherwise. The evidence showed Balooshi (i) redrafted the Fund's marketing materials to attract investors; (ii) utilized and visited his professional network in the Gulf to lay the groundwork for promoting the Fund there in the future; (iii) organized the Road Show, including the investor meetings and daily logistics; (iv) coached GVPGC management on how best to appeal to the Road Show investors; (v) followed up with the Road Show investors to encourage their interest; (vi) created reports that tracked their engagement levels; (vii) recommended alternative strategies for obtaining foreign investments beyond those possible in the Gulf; and (viii) led weekly team discussions during which he updated GVPGC management on his ongoing progress and proposed new ideas.

Without evidentiary support for a total non-performance theory, the Company pivots to arguing that Balooshi is not entitled to any damages because (a) no one

---

[48] D.I. 58 at 21 (Def.'s Post-Trial Br.).

invested in the Fund; and (b) he failed to use his "best efforts" to obtain investments. These arguments are contradicted by the Agent Agreement.

### a. The lack of actual investment argument fails.

The Company argues that Balooshi is not entitled to his pay because he failed to obtain any investments for the Fund. But the Agent Agreement built the actual investment requirement into the Referral Fee, not the Flat Fee, and Balooshi never asked for a Referral Fee. The Company's contrary contractual interpretation is not reasonable.

The Agent Agreement's plain language does not impose conditions on the Flat Fee. The Flat Fee was not bound to the Fund's success, but rather, was payable as a salary each month. In contrast, the Referral Fee was payable as a commission and so was unavailable unless Balooshi actually secured investments for the Fund. By separating the Agent Agreement into two Fees, the parties plainly intended to separate the bases for paying those Fees too.

What the Agent Agreement's plain language suggests, its basic commercial context confirms. The Fund intended to offer $150 million (*i.e.*, six $25 million units each split into six $6.25 million pieces) in equity to founding investors over four capital calls.[49] A commission of at least 3% on each referred pledgor would have rewarded Balooshi with a substantial bonus. Understandably, GVPGC was

---

[49] Agent Agreement at 11.

unwilling to pay the Referral Fee on such large values unless Balooshi's investors committed. Given GVPGC's conceded liquidity problems, paying the Referral Fee would not have been possible otherwise anyway. From this view of the evidence, it makes sense why a commission would require conditions and results, but a comparatively modest $15,000 salary would require neither.

An interpretation that requires Balooshi to secure actual investments to obtain both the Flat and Referral Fees would impermissibly render the Agent Agreement's dual compensation structure redundant[50] or one Fee superfluous.[51] On that reading, every Fee would be a Referral Fee. That interpretation also would, counterintuitively, require Balooshi to earn a commission before he could receive a salary. Had these consequences been the parties' intent, the Agent Agreement's unambiguous language would have reflected it. It does not because it was not. The

---

[50] *Cf. Sycamore Partners Mgmt., L.P. v. Endurance Am. Ins. Co.*, 2021 WL 4130361, at *12 n.98 (Del. Super. Ct. Sept. 10, 2021) ("[A] construction that produces some redundancy is acceptable if the construction gives effect to the contract language and discharges the parties' intent." (internal quotation marks omitted)); *U.S. W., Inc. v. Time Warner Inc.*, 1996 WL 307445, at *15 (Del. Ch. June 6, 1996) ("While redundancy is sought to be avoided in interpreting contracts, this principle of construction does not go so far as to counsel the creation of contract meaning for which there is little or no support in order to avoid redundancy.").

[51] *See, e.g.*, *Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.*, 872 A.2d 944, 956 (Del. 2005) ("Generally, and absent evidence calling for a different result, all parts of a contract must be read in harmony to determine the contract's meaning, with one portion of a contract not being read to negate a different portion."); *Sonitrol Holding Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992) ("Under general principles of contract law, a contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless.").

Company cannot rewrite the Agent Agreement by grafting onto the provisions guaranteeing the Flat Fee the performance standards qualifying the Referral Fee.[52]

Although the Flat Fee was unqualified, the Company was not shackled to it. As Billings recognized, GVPGC could discontinue the Flat Fee by firing Balooshi. Terminating the Agent Agreement, however, did not absolve past debts under it. The fact that GVPGC did not fire Balooshi until it amassed over $130,000 in unpaid bills does not mean the balance is any less due. It simply suggests the Company waited too long. Investments or not, the evidence failed to justify GVPGC's breach.

### b. The "best efforts" argument fails.

Alternatively, the Company argues Balooshi is not entitled to his pay because he did not use his "best efforts" to obtain investments for the Fund. The "best efforts" clause is a provision in the Agent Agreement[53] that was not discussed at trial and this argument did not appear until GVPGC's post-trial brief. Although a best efforts requirement does appear in the Agent Agreement, its late arrival to the case comes without evidentiary support and, on this record, fails to support a defense.

---

[52] *See, e.g.*, *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement, and that each word should be given meaning and effect by the court."), *aff'd*, 2008 WL 571543 (Del. Mar. 4, 2008); *see also E.I. du Pont de Nemours & Co., Inc. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("[T]he meaning [that] arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme and plan.").

[53] Agent Agreement at 3.

The Agent Agreement did not define "best efforts." But that is not an invitation for the Company to define it with the Herculean labors it seeks to insert.[54] To the contrary, a clause requiring a party to use its best efforts "cannot mean" that the party must do "everything possible under the sun."[55] Because the duty to use best efforts "depends on others or may be hindered by events beyond the party's control,"[56] best efforts clauses are "implicitly qualified by a reasonableness test."[57]

Balooshi's efforts were reasonable. The evidence showed that Balooshi undertook multiple efforts to market the Fund before, during, and after the Road Show. Balooshi thus discharged one of his chief functions: "assisting in the process" of securing investments for the Fund.[58] The work he completed cannot be discounted as a "waste of time"[59] merely because the Gulf investors decided to walk. After all, Balooshi was not required, as Billings contended, to achieve "actual

---

[54] *See, e.g.*, D.I. 58 at 9–16, 22 (Def.'s Post-Trial Br.) (offering a menu of efforts it never communicated to Balooshi, but still believes Balooshi should have done).

[55] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *91 (Del. Ch. Nov. 30, 2020) (internal quotation marks omitted), *aff'd*, -- A.3d --, 2021 WL 5832875 (Del. Dec. 8, 2021). *See Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272–73 (Del. 2017) (approving a "reasonable steps" standard in the efforts clause context). *See also Channel Medsys., Inc. v. Bos. Sci. Corp.*, 2019 WL 6896462, at *37 n.410 (Del. Ch. Dec. 18, 2019) (noting that there is "little support" in Delaware law for drawing "distinctions" between types of efforts clauses (*e.g.*, "reasonable" efforts vs. "best" efforts clauses)).

[56] *Akorn, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *86 (Del. Ch. Oct. 1, 2018), *aff'd*, 2018 WL 6427137 (Del. Dec. 7, 2018).

[57] *AB Stable*, 2020 WL 7024929, at *91 (internal quotation marks omitted).

[58] Agent Agreement at 1.

[59] D.I. 58 at 13, 21 (Def.'s Post-Trial Br.).

20

results" to get paid.[60]  By only asking for his best efforts, rather than a measurable quantum of performance, the Company assumed the risk that Balooshi would be unsuccessful in securing investors from the Middle East.  Stated another way, the Company could have defined the Flat Fee using specific efforts.  It did not.  The Court, however, must "interpret the contracts as written and not as hoped for by litigation-driven arguments."[61]

Plus, the Company's best efforts argument again conflates the Referral and Flat Fees.  If "securing actual investments" were synonymous with "best efforts," then there would be no reason for a Flat Fee.[62]  Put differently, if the Company intended Balooshi to work solely on commission, then the Agent Agreement would not have granted him a salary.  As a result, GVPGC's reading "violat[es] the basic rule of construction that no part of an agreement should be rendered superfluous."[63]

In sum, none of the evidence showed that Balooshi breached the Agent Agreement.  Accordingly, the Company's material breach defense fails.

---

[60] JX65.

[61] *Urdan v. WR Cap. Partners, LLC*, 244 A.3d 668, 675 (Del. 2020).

[62] *See DCV Holdings, Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

[63] *Intel Corp. v. Am. Guar. & Liab. Ins. Co.*, 51 A.3d 442, 451 (Del. 2012).

## 2. There was no implied covenant in the Agent Agreement.

Unable to find support in the Agent Agreement's express terms, the Company resorts to searching for implied ones. It contends that Balooshi breached the implied covenant of good faith and fair dealing by "frustrating the [Agent] Agreement's overarching purpose" and "lazily control[ling] the presentation of the Fund's interests."[64] The Company failed to prove a breach of the implied covenant.

To prove a breach of an implied covenant, the claimant must demonstrate by a preponderance of the evidence (i) a specific, implied contractual obligation; (ii) a breach of that obligation; and (iii) resulting damage.[65] The implied covenant of good faith and fair dealing is a gap-filling device that addresses unanticipated contractual developments by inferring terms in an agreement's express language to which the parties would have agreed at the time of contracting had they considered them.[66] "Existing contract terms control, however," and so the covenant "cannot be used to circumvent the parties' bargain[] or to create a free-floating duty . . . unattached to the underlying" agreement.[67] As a consequence, "[a]n essential predicate for the application of the implied covenant is the existence of a 'gap' in the relevant

---

[64] D.I. 58 at 31 (Def.'s Post-Trial Br.).
[65] *E.g.*, *Buck v. Viking Holding Mgmt. Co. LLC*, 2021 WL 673459, at *5 (Del. Super. Ct. Feb. 22, 2021).
[66] *E.g.*, *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017); *Katz v. Oak Indus., Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986).
[67] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (omission in original) (internal quotation marks and citations omitted).

agreement."[68]    The implied covenant is inapplicable unless the asserting party

demonstrates that the agreement is "truly silent" on the obligation asserted.[69]

The Company did not identify a gap in the Agent Agreement.  Far from

suggesting the existence of an implied term, the Agent Agreement expressly

provided that Balooshi was not required to achieve certain results to be paid the Flat

Fee and his reasonable expenses.  To reiterate: The Agent Agreement made Flat Fee

payments and expense reimbursements automatic, tempered only by the Company's

right to terminate.  Properly construed, then, the Company's implied covenant

amounts to a repackaged version of its failed express breach defense.  The covenant

does not work that way.[70]  Accordingly, the implied covenant defense fails.

The Company's contrary reasoning misunderstands the implied covenant.

GVPGC contends, for example, that Balooshi could "breach . . . the duty of good

---

[68] *DG BF, LLC v. Ray*, 2021 WL 776742, at \*15 (Del. Ch. Mar. 1, 2021).

[69] *Oxbow Carbon & Min. Holdings, Inc. v. Crestview–Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (internal quotation marks omitted).  *Cf. Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013) ("Express contractual provisions always supersede the implied covenant . . . ." (internal quotation marks omitted)), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013).

[70] *E.g.*, *Nationwide Emerging Managers, LLC v. Northpointe Holdings, LLC*, 112 A.3d 878, 896 (Del. 2015) (The implied covenant "does not apply when the contract addresses the conduct at issue."); *Nemec v. Shrader*, 991 A.2d 1120, 1125–26 (Del. 2010) ("One generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement." (alteration and internal quotation marks omitted)).

faith and fair dealing even if there was no breach of the underlying contract."[71] He could have—but only if, as a threshold matter, the Company proved the Agent Agreement was truly silent on the issues of performance and payment. It did not.

Similarly, the Company could not prove an implied covenant by claiming Balooshi secretly intended not to perform. "Notwithstanding the covenant's potentially misleading moniker . . . a claim for breach of the implied covenant is a contract claim . . . ."[72] A contract claim does not depend for its proof on a mental state.[73] Instead, it depends on actions or omissions. But here, the Company failed to prove Balooshi did or did not do something that excuses it from paying him.

Finally, the Company could not prove an implied covenant by simply calling Balooshi's failure to meet its own expectations "bad faith." The implied covenant is a contract claim, not a tort or fiduciary claim. As a result, "allegations of bad faith conduct" are irrelevant.[74] Indeed, the covenant's "good faith" component "does not envision loyalty to [a] contractual counterparty."[75] Despite its name, "the covenant does not establish a free-floating requirement that a party act in some morally

---

[71] D.I. 58 at 31 (Def.'s Post-Trial Br.).

[72] *ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 444–45 (Del. Ch. 2012), *rev'd on other grounds*, 68 A.3d 665 (Del. 2013).

[73] *Id.* at 442.

[74] *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

[75] *Gerber*, 67 A.3d at 419 (emphasis and internal quotation marks omitted).

commendable sense."[76]  And it does not "necessarily require that a party have acted in subjective good faith."[77]  The covenant is controlled by the parties' original intent—not a one-sided notion of fairness urged at the time of the alleged wrong.[78]

Here, the Company has tried to use the covenant to "rebalanc[e] economic interests" upset by the Fund's inability to attract investors.[79]  But the implied covenant cannot be used to "rewrite a contract" the Company "now believes to have been a bad deal.  Parties have a right to enter into good and bad contracts, the law enforces both."[80]  The Company's remorse is no reason to deny Balooshi his pay.[81]

**3. Any illegality in the Agent Agreement did not warrant total avoidance.**

Having found the Agent Agreement to be no help, the Company hopes to discard it altogether.  Halfway through the case, the Company began arguing that the Agent Agreement was illegal because it required Balooshi to engage in securities activities reserved for federally registered broker-dealers, of which he is not one.  As

---

[76] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 182–83 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015).
[77] *Id.* at 183.
[78] *See Gerber*, 67 A.3d at 418–19.
[79] *Oxbow*, 202 A.3d at 507 (internal quotation marks omitted).
[80] *Nemec*, 991 A.2d at 1126.  *See also Oxbow*, 202 A.3d at 507 ("An interpreting court . . . should be most chary about implying a contractual [term] when the contract could easily have been drafted to expressly provide for it." (alteration and internal quotation marks omitted)).
[81] *E.g.*, *Miller v. HCP & Co.*, 2018 WL 656378, at *2 (Del. Ch. Feb. 1, 2018) ("The implied covenant . . . is meant to enforce the intent of the parties, and not to modify that expressed intent where remorse has set in.").

an initial matter, the Court notes that illegality is an affirmative defense that must be raised in an answer or else be waived.[82]  The Company did not raise illegality in its answer.  Nevertheless, because Balooshi entertained this defense on summary judgment and at trial, the Court will address its merits.  The Court, however, need not make a finding on whether the Agent Agreement is illegal.  Assuming, for analytical purposes alone, that the Company proved certain aspects of the Agent Agreement were illegal, the Company still did not prove that the entire Agent Agreement is unenforceable.

In general, Delaware law prohibits courts from enforcing illegal agreements.[83]  But not all "illegal agreements are . . . automatically void" and some "may not even be unenforceable."[84]  Take, for example, a partially illegal contract.[85]  In that case, the contract may be "divisible" by its lawful and unlawful terms and so potentially enforceable on its lawful terms.[86]  In determining whether a partially illegal contract is enforceable on its lawful terms, two preliminary issues must be resolved.

---

[82] Del. Super. Ct. Civ. R. 8(c); *James v. Glazer*, 570 A.2d 1150, 1153 (Del. 1990).

[83] *E.g.*, *Lincoln Nat'l Life Ins. Co. v. Joseph Schlanger 2006 Ins. Tr.*, 28 A.3d 436, 441 (Del. 2011); *Della Corp. v. Diamond*, 210 A.2d 847, 849 (Del. 1965).  *See also* Restatement (Second) of Contracts § 178 (1981).

[84] 1 Williston on Contracts § 3:3, Westlaw (4th ed. database) (last updated Nov. 2021).  The Supreme Court has relied on Professor Williston in analyzing contract issues.  *E.g.*, *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229, 1231 & nn.142–43 (Del. 2018).

[85] *See, e.g.*, *Doe v. Cedars Acad., LLC*, 2010 WL 5825343, at *4 (Del. Super. Ct. Oct. 27, 2010).

[86] *Id.*; *see also* Restatement (Second) of Contracts § 198.

First, the Court must determine whether the contract's illegal terms are so "central to the parties' agreement" that the plaintiff cannot prove its breach-of-contract claim without them.[87]  If they are, then the contract is void despite any lawful terms expressed therein.[88]

Second, if the plaintiff can sustain its claim on the contract's lawful terms alone, then the Court must determine whether the parties intended the lawful terms to be "severable," *i.e.*, enforced notwithstanding partial avoidance.[89]  The parties' intent may be determined conclusively from their agreement's plain language.[90]  If the parties "expressed in the contract directly" an expectation of severability—*e.g.*, included an unambiguous severability clause—then the Court may sever and enforce the lawful terms.[91]

### a. Balooshi proved his case without relying on illegal terms.

The Company insists the Flat Fee could not have been earned without a broker-dealer license.  But the only (arguable) references in the Agent Agreement[92]

---

[87] 1 Williston on Contracts § 3:3.

[88] *Id.* §§ 3:3, 19:11–19:12.

[89] *Doe*, 2010 WL 5825343, at *4; 1 Williston on Contracts § 3:3.

[90] *E.g.*, *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[91] *Doe*, 2010 WL 5825343, at *4.

[92] The Company relies largely on extrinsic evidence in a private placement memorandum to support a finding that the Agent Agreement is illegal.  *E.g.*, D.I. 58 at 22 (Def.'s Post-Trial Br.).  But the Agent Agreement is unambiguous, making extrinsic evidence inadmissible.  *E.g.*, *Sunline*, 206 A.3d at 847.  Even so, the Company concedes that "Balooshi was not involved in the preparation of the"

27

to the securities laws arise from the Referral Fee, not the Flat Fee. Under the Agent Agreement, the Referral Fee was subject to "laws and regulations."[93] The Flat Fee was not. Assuming those laws and regulations are "securities" laws and regulations—which the Company never showed[94]—the Company (at best) could have proved something illegal about the Referral Fee. But Balooshi never sought a Referral Fee. Accordingly, even if illegal, he did not need it to prove his claim.

### b. The Flat Fee is severable and enforceable.

Since Balooshi's case did not hinge on the "illegal" Referral Fee, the lawful Flat Fee will remain enforceable if it is severable. It is. The Agent Agreement contains a severability clause through which the parties "expressed . . . directly"[95] that, if "any part" of the Agent Agreement was "held unenforceable," the unenforceable part would "not affect the validity or enforceability of any other

---

memorandum. D.I. 58 at 4 n.1 (Def.'s Post-Trial Br.). So it does not "speak to the intent of *all* parties" at the time the Agent Agreement was executed. *SI Mgmt.*, 707 A.2d at 43. *See also* D.I. 53 at 33:10–19 (Trial Tr.) (Sept. 13, 2021) (Balooshi testifying that securities registration was not discussed at the time the Agent Agreement was executed or any time after). The Court therefore gives it no weight. *See SI Mgmt.*, 707 A.2d at 44 ("Because the . . . terms . . . appear[] to have been entirely within the control of *one party* . . . extrinsic evidence is irrelevant . . . .").
[93] Agent Agreement at 11.
[94] Delaware law typically requires an express reference to "securities" for a contract to incorporate federal securities law. *See In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 572–75 (Del. 2019). The Company has not acknowledged this precedent.
[95] *Doe*, 2010 WL 5825343, at *4.

part."[96] "Generally, a severability clause is enforceable."[97] And the Company has offered no reason to think this one is not. As a result, the Court finds that the Flat Fee is enforceable against the Company even if the Referral Fee is illegal. Accordingly, the illegality defense failed.

### 4. Balooshi did not breach the NDA.

Having exhausted the Agent Agreement, the Company summons the NDA. At trial, the Company sought to prove that Balooshi breached the NDA by joining Native's Vektor Vodka campaign and pursuing Eckholm for an initial investment. In its post-trial brief, however, the Company seems to have abandoned its NDA contract theory in favor of pressing the NDA fiduciary duty theory discussed below.[98] To be sure, the Court finds GVPGC failed to prove any lasting claim to a contractual breach of the NDA.

The NDA contract defense rested on Billings's termination e-mail. In the e-mail, Billings alleged that Balooshi breached the NDA by using GVPGC's contacts

---

[96] Agent Agreement at 3, 9.

[97] *Evans v. State*, 872 A.2d 539, 552 (Del. 2005). *See also Eagle Force*, 187 A.3d at 1239 (suggesting that the trial court erred in failing to consider the effect of a valid severability clause that used substantially similar language to the Agent Agreement's severability clause).

[98] *See* D.I. 58 at 27 (Def.'s Post-Trial Br.) ("Balooshi breached his fiduciary duties to GVPGC through his solicitation of . . . Vektor . . . . *Beyond the fact that this was a breach of the NDA, . . .* this was all done when he should have been focused on GVPGC." (emphasis added)). *See also* D.I. 47 § 3 (Pre-Trial Stip.) (limiting NDA presentation to fiduciary duty defense).

to solicit Native and Eckholm without the Company's permission. The evidence showed that the e-mail itself was a bit of revisionist history and that its underlying premises were incorrect.

Recall that the NDA barred Balooshi from soliciting persons on the no-contact list and from disclosing GVPGC information to them for his "own benefit."[99] But none of the Native parties was on the no-contact list and neither was Eckholm.[100] And GVPGC—as well as Billings individually—collaborated with Balooshi to pursue Vektor.[101] Balooshi even offered GVPGC a percentage of his commissions. Given all this, the Company's evidence did not show that Balooshi breached the NDA. It also did not show why a breach of the NDA would excuse, rather than offset, overdue payments recurring under the Agent Agreement.[102] Accordingly, any remnants of the NDA contract defense failed for lack of breach and damages.

### 5. The Court lacked jurisdiction over the fiduciary duty defense.

The Company sought to prove the NDA imposed fiduciary duties on Balooshi that he violated by dividing his loyalties between Vektor and the Fund. At trial, the

---

[99] NDA § 6.

[100] *See generally id.* at Exs. A & B. *See also id.* § 11 (stating that the no-contact is "limited to" the parties on the list).

[101] *See id.* § 5 (providing that information may be disclosed upon "written consent").

[102] *But see id.* § 13 (providing NDA-specific breach remedy). For a fuller discussion of this problem, *see infra* Legal Conclusions § 6.

Court[103] reminded the Company that it lacks subject matter jurisdiction over disputes involving breaches of fiduciary duty.[104] So the Company gained a burden to prove another basis for jurisdiction over this defense.[105] It did not because none exists.

Undeterred, the Company contends that the rules precluding this Court from deciding fiduciary duty *claims* do not apply to fiduciary duty *defenses*.[106] This is a distinction without difference. Rights and duties inherent to fiduciary relationships derive from equity, not law.[107] And the Delaware Court of Chancery has exclusive jurisdiction over equitable disputes.[108] So whether asserted as a claim or raised as a

---

[103] *See* D.I. 54 at 84 (Trial Tr.) (Sept. 14, 2021); *see generally* Del. Super. Ct. Civ. R. 12(h)(3) (requiring that any jurisdictional issue be raised *sua sponte* even if the parties do not raise it themselves). *See also Stroud v. Milliken Enters., Inc.*, 552 A.2d 476, 477 (Del. 1989) (dismissing appeal for lack of jurisdiction after the jurisdictional issue was raised by the Court at oral argument).

[104] *E.g.*, *KT4 Partners LLC v. Palantir Techs. Inc.*, 2021 WL 2823567, at *24 (Del. Super. Ct. June 24, 2021) (articulating rule and collecting authority).

[105] *Cf. Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007).

[106] D.I. 58 at 27 (Def.'s Post-Trial Br.) (citing *USH Ventures v. Glob. Telesys. Grp., Inc.*, 796 A.2d 7 (Del. Super. Ct. 2000)). *But see Reybold Venture Grp. XI–A, LLC v. Atl. Meridian Crossing, LLC*, 2009 WL 143107, at *3, *4 (Del. Super. Ct. Jan. 20, 2009) (disapproving *USH Ventures* as "not support[ed]" by "Delaware case law" and observing that breach of fiduciary duty is a "cause of action, not a defense"); *but see also NASDI Holdings, LLC v. N. Am. Leasing, Inc.*, 2019 WL 1515153, at *6 n.47 (Del. Ch. Apr. 8, 2019) (disapproving *USH Ventures* for additional reasons).

[107] *E.g.*, *McMahon v. New Castle Assocs.*, 532 A.2d 601, 603–05 (Del. Ch. 1987).

[108] *E.g.*, *Dickerson v. Murray*, 2015 WL 447607, at *3, *6–7 (Del. Super. Ct. Feb. 3, 2015); *accord Prospect Street Energy, LLC v. Bhargava*, 2016 WL 446202, at *3–6 (Del. Super. Ct. Jan. 27, 2016); *see generally Monroe Park v. Metro. Life Ins. Co.*, 457 A.2d 734, 738 (Del. 1983) (discussing the "historic and constitutional" bases for Delaware's juridical separation of law from equity (first citing Del. Const. art. IV, §§ 7, 10; then citing 10 *Del. C.* §§ 341, 542 (2020))).

31

defense, the upshot is the same: the Company's breach of fiduciary duty theory did not belong in this Court.[109]  Accordingly, the Court will not consider it further.

### 6. The Company failed to prove damages.[110]

Even if the Company had proved liability, it would not have proved damages. The Company's Agent Agreement and NDA defenses fit two remedial paradigms, respectively: recoupment and setoff.  By definition, both require some proof of loss.[111]  Because of that, one might have supposed that the Company had articulated an amount at which its alleged injuries lessened the outstanding Flat Fees and expenses and then proposed a counterbalance for the Court's assessment that took the difference.[112]  It did neither.  Without evidence of a quantifiable injury, GVPGC

---

[109] *See Reybold*, 2009 WL 143107, at *3 ("This Court will not exercise jurisdiction over a purely equitable cause of action exclusively within the jurisdiction of the Court of Chancery merely because it is coupled with an affirmative defense."); *see also Dickerson*, 2015 WL 447607, at *6 ("[T]he nature of the remedy, in and of itself, is not dispositive in terms of jurisdiction . . . . Jurisdiction for a breach of fiduciary duty action is properly in the Chancery Court, even if only monetary damages are sought, because the claim arises out of a relationship that is equitable . . . ." (citations omitted)).  *E.g.*, *Columbus Life Ins. Co. v. Wilmington Tr. Co.*, 2021 WL 537117, at *8 (Del. Super. Ct. Feb. 15, 2021) (dismissing equitable contract defenses for lack of jurisdiction); *Sun Life Assurance Co. v. Wilmington Tr., Nat'l Ass'n*, 2018 WL 3805740, at *3 (Del. Super. Ct. Aug. 9, 2018) (same).

[110] This discussion does not capture GVPGC's illegality defense, which sought avoidance as relief.

[111] *See Recoupment*, *Black's Law Dictionary* (11th ed. 2019); *Setoff*, in *id.*

[112] *See Finger Lakes Cap. Partners, LLC v. Honeoye Lake Acquisition, LLC*, 151 A.3d 450, 453 (Del. 2016) ("Setoff and recoupment are different but related defenses.  Set-off is a mode of defense by which the defendant acknowledges the justice of the plaintiff's demand, but sets up a defense of his own against the plaintiff, to counterbalance it either in whole or in part.  Recoupment, on the other hand, is a

could not have proved recoupment or setoff. Accordingly, GVPGC's defenses would have failed for lack of damages.

In sum, GVPGC breached the Agent Agreement and had no defenses to its breach. The Court therefore awards Balooshi the relief below.

## RELIEF AWARDED

In addition to $130,221.51 in damages, plus costs,[113] Balooshi is entitled to pre- and post-judgment interest. He cannot, however, shift his attorney's fees.

## A. Balooshi Is Entitled to Pre- and Post-Judgment Interest At the Legal Rate

Delaware law awards pre-judgment interest as a matter of right.[114] In contract actions, pre-judgment interest is computed from the date of the breach.[115] Here, Balooshi essentially forgave the Company's breaches until May 28, 2018—the date he sent GVPGC his final invoice and began making unrequited demands for assurances. Accordingly, pre-judgment interest accrues as of May 28, 2018.

Where, as here, the parties' contract does not supply an interest rate, a statutory interest rate applies instead. By statute, "the legal rate of interest shall be

---

species of defense somewhat analogous to set-off in its character, the chief distinction, however, being that the defense of set-off arises out of an independent transaction, but the defense of recoupment goes to the reduction of the plaintiff's damages for the reason that he, himself, has not complied with the cross obligations arising under the same contract." (internal quotation marks and citation omitted)).

[113] Del. Super. Ct. Civ. R. 54(d).

[114] *E.g.*, *Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 486 (Del. 2011).

[115] *E.g.*, *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 826 (Del. 1992).

5% over the Federal Reserve discount rate including any surcharge" calculated from the date of the breach.[116] This legal rate is simple and fixed.[117] Accordingly, Balooshi is entitled to pre-judgment interest accruing as of May 28, 2018 at a simple, fixed rate of 5% over the Fed discount rate published at that time.

As to post-judgment interest, "Delaware law provides that [it] is a right belonging to the prevailing plaintiff . . . ."[118] Post-judgment interest accrues "from the date of the judgment."[119] Again, unless the parties' contract specifies otherwise, the rate is simple and fixed at 5% over the Federal Reserve discount rate published on the date the judgment is entered.[120] Accordingly, Balooshi is entitled to post-judgment interest accruing as of the time this judgment is entered at a simple, fixed rate of 5% over the Fed discount rate published at the time of this judgment's entry.

## B. Balooshi Is Not Entitled to His Attorney's Fees

Balooshi contends that GVPGC also must cover his attorney's fees because it conducted this litigation in bad faith. As support for fee-shifting, Balooshi alleges discovery violations and argues that the Company reversed its pre-suit position—

---

[116] 6 *Del. C.* § 2301(a) (2020).

[117] *E.g.*, *CIGNEX Datamatics, Inc. v. Lam Rsch. Corp.*, 2021 WL 212692, at *2 (D. Del. Jan. 21, 2021) (summarizing and applying Delaware prejudgment interest law); *cf. Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 173 (Del. 2002) ("Delaware courts have traditionally disfavored compound interest.").

[118] *Wilmington Country Club v. Cowee*, 747 A.2d 1087, 1097 (Del. 2000).

[119] 6 *Del. C.* § 2301(a).

[120] *Id.*; *see Noranda Aluminum Holding Corp. v. XL Ins. Am., Inc.*, -- A.3d --, 2021 WL 5961628, at *4, *7 (Del. Dec. 16, 2021).

*i.e.*, that Balooshi was not in breach—to mount dilatory and meritless defenses. Although the Company's opposition was dubious and some of its discovery seemed questionable, the Court does not find that Balooshi has met the exacting standard for shifting his attorney's fees.

Delaware follows the American Rule,[121] under which "each party is normally obligated to pay . . . [its] own attorney's fees, whatever the outcome of the litigation."[122] Courts, however, may vary the American Rule to sanction "bad faith" litigation conduct.[123] The bad faith exception "deter[s] abusive litigation and . . . protects the integrity of the judicial process."[124] Using the bad faith exception, the Court may shift fees to a party who increased litigation costs by "bringing baseless claims or . . . through other" misconduct.[125] The bad faith exception sets a high bar. Subjective culpability, not mere hard-dealing, is required, and the movant must adduce clear evidence of wrongdoing to succeed:

> An award of fees for bad faith conduct must derive from either the commencement of an action in bad faith or bad faith conduct taken during litigation, and not from conduct that gave rise to the underlying cause of action . . . . [T]he bad faith exception applies only in extraordinary cases, and the party seeking [fees] must demonstrate by clear evidence that the party from whom fees are sought acted in subjective bad faith. [Delaware] courts have not settled on a singular definition of bad faith . . . but have found bad

---

[121] *E.g.*, *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

[122] *Johnston v. Arbitrium (Cayman Is.) Handels AG*, 720 A.2d 542, 545 (Del. 1998).

[123] *E.g.*, *Brice v. Del. Dep't of Corr.*, 704 A.2d 1176, 1179 (Del. 1998).

[124] *Montgomery Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 227 (Del. 2005).

[125] *Blue Hen Mech., Inc. v. Christian Bros. Risk Pooling Tr.*, 117 A.3d 549, 559–60 (Del. 2015).

faith where parties have unnecessarily prolonged or delayed litigation, falsified records, or knowingly asserted frivolous claims. Further, [courts] have recognized the bad faith exception where a party is found to have misled the court, altered testimony, or changed position on an issue.[126]

Even so, the decision to shift fees is always up to the Court's discretion.[127]

The Court has reviewed all the evidence surrounding this issue and finds that Balooshi has not demonstrated GVPGC's subjective bad faith by clear evidence. It is true, for example, that GVPGC produced two termination e-mails that bear some cosmetic dissimilarities and appear *non sequitur* to the messages underneath them. But the reason for those discrepancies might be technological and shifting fees because of them would be extreme absent clearer facts.[128] Moreover, the Court understands that GVPGC did not fault Balooshi's performance until he sued. But, before litigation, the Company was not represented by counsel, who may have advised it on defense theories of which it had not been aware.[129] Under these

---

[126] *RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (cleaned up).

[127] *Id.* at 879.

[128] *See Johnston*, 720 A.2d at 546 & n.27 (giving "falsified records" as an example of bad faith, but noting that "insufficient proof that [the] documents in question were falsified" counsels against fee-shifting (citation omitted)); *see also Pettry v. Gilead Scis., Inc.*, 2021 WL 3087027, at *1 (Del. Ch. July 22, 2021) (observing that a "glaring egregiousness" standard is appropriate for assessing bad faith).

[129] *See Gen. Video Corp. v. Kertesz*, 2009 WL 106509, at *1 (Del. Ch. Jan. 13, 2009) (explaining that the bad faith exception does not apply just because the losing party's "allegations were disproven at trial"); *cf. Versata Enters., Inc. v. Selectica, Inc.*, 5 A.3d 586, 607 (Del. 2010) ("Generally, the bad faith exception to the American Rule . . . does not apply to the conduct that gives rise to the substantive claim itself." (internal quotation marks omitted)).

circumstances, the Court finds fee-shifting unwarranted.[130]  Accordingly, Balooshi's request for fee-shifting is denied.

## VERDICT

Having considered all the evidence, the Court finds in favor of Balooshi on his breach-of-contract claim and awards him $130,221.51 in damages, plus costs and pre- and post-judgment interest.  The parties shall submit an appropriate form of order for the Court's approval that implements this verdict, including the specific rates of interest calculated on the terms found applicable above, as a final judgment.

**IT IS SO ORDERED**.

Charles E. Butler, Resident Judge

---

[130] *See RBC Cap.*, 129 A.3d at 879 (observing that fee-shifting "is a matter . . . within the discretion of the trial judge" and explaining that a trial court does not "abuse [its] discretion" just because another court "may . . . come to a different conclusion").